Lilly Mae Onie Lee Whitelaw HILLI-
ARD, Plaintiff-Appellant,

v.

John L. WILLIAMS and Donn Clark,
Defendants-Appellees.

Appeal of John L. WILLIAMS.

Appeal of Donn CLARK.

Nos. 74–1356 to 74–1358.

United States Court of Appeals,
Sixth Circuit

May 28, 1975.

Dwayne D. Maddox, Huntingdon, Tenn., Julian P. Guinn, Paris, Tenn., for plaintiff-appellant.

David R. Farmer, Roy Hall, Waldrop, Hall, Tomlin & Farmer, Franklin Murchison, Murchison & Murchison, Jackson, Tenn., for Clark and Williams.

Before PHILLIPS, Chief Judge, EDWARDS, Circuit Judge, and O'SULLIVAN, Senior Circuit Judge.

PHILLIPS, Chief Judge.

This appeal grows out of an action brought by plaintiff Hilliard under 42 U.S.C. §§ 1983, 1985 against District Attorney General John L. Williams and against Donn Clark, an agent of the Tennessee Bureau of Criminal Identification. The complaint alleged that the defendants withheld exculpatory evidence and presented false and misleading testimony at Mrs. Hilliard's criminal trial on the charge of murder. After a nonjury trial, the District Court awarded nominal damages of $1 each against Williams and Clark and costs against Williams. All of the parties appealed to this court. For the reasons stated below, we reverse and remand for further proceedings.

In late 1969, Mrs. Hilliard came to Tennessee from her home in Indiana to obtain her share of land that she held in common with her aunt, Vina Price. Ernie Price, the husband of Vina Price, disputed Mrs. Hilliard's claim to the land, and Mrs. Hilliard retained an attorney to protect her interest.

On February 19, 1970, Ernie Price died from the effects of two axe blows and a shotgun wound to the head and mouth. It appeared that Mr. Price had been murdered inside his home and the body thereafter dragged outside. One of Mrs. Hilliard's shoes was found near the scene of the crime. According to Mrs. Hilliard, just before the murder Mr. Price had threatened her with a shotgun, and she fled toward a neighbor's house, losing the shoe in the process. She claimed to have heard a shotgun blast while running. Upon arriving at the neighbor's home, she telephoned her attorney, who in turn called the authorities.

Later that day Mrs. Hilliard was arrested. Defendant Clark, who had been assigned to investigate the murder, seized as evidence a curtain from the Price home and the jacket Mrs. Hilliard was wearing when arrested, both of which contained small stains that Clark thought might be blood. Clark sent the curtain and the jacket to the F.B.I. laboratory in Washington for analysis of the stains. In late March of 1970, the F.B.I. returned both items and submitted a report stating: "No blood was identified on Q1 [jacket] or Q2 [curtain]." Agent

Clark considered the report inconclusive and sent the jacket and curtain to Nashville to be forwarded back to the F.B.I. for further analysis. Unknown to either defendant, the jacket for some reason never left Nashville. On May 28, 1970, the F.B.I. reported that the stains on the curtain were composed of paint or varnish.

Before Mrs. Hilliard's murder trial began on May 12, 1970, the defendants discussed the first F.B.I. report at least twice. Williams instructed Clark not to mention the report in his testimony unless specifically questioned about it. Defendant Williams did not reveal the contents of the report to Mrs. Hilliard or to her attorney. To the contrary, in his capacity as prosecuting attorney he allowed the following testimony to be elicited from Agent Clark without correction or explanation:

### DIRECT EXAMINATION BY GEN. SMITH:

Q. 66 Did you proceed to inspect the living room furniture then?

A. Yes sir, I found what looked to be blood stains on the arm of the arm chair, on the north side of the house, sort of behind the stove,—

Q. 67 All right, go ahead?

A. Also found blood stains on the floor in front of the chair, and some on the curtains behind the stove, then on the back of the couch on the north wall of the living room, the wall looked wet, as if it had been washed behind the couch there.

Q. 108 Now, did the defendant continue to remain in the Sheriff's car while you all made the investigation?

A. Yes, she stayed in the back seat of the sheriff's car.

Q. 109 Now, did you take a picture of her?

A. Yes. (shows photo)

Q. 110 Was that the way she was dressed when you took the picture of her?

A. Yes, that was made at the jail.

Q. 111 What kind of coat is that?

A. A blue nylon windbreaker type coat.

Q. 112 All right, did you find any blood stains on that?

A. Yes sir, I found some spots on it.

Q. 113 What did they appear to be?

A. They appeared to be blood stains.

Q. 114 Where were they?

A. They were on the right tail of the coat, right front of the coat.

### CROSS–EXAMINATION BY MR. MADDOX:

Q. 55 Was there any indication of any blood stains on the floor where the water was?

A. No sir,—on the edge of where the water was is where you could see the blood stains.

Q. 56 Now, how do you know it was blood stains?

A. That is what it looked to me like.

Q. 57 Did you have it examined to see what it was?

A. No, I didn't have it analyzed.

Q. 58 Did you have anything analyzed off the couch to determine if it was blood?

A. No sir.

Q. 59 Did you have the curtains analyzed?

A. I sent them off to the FBI lab and they aren't back yet.

Q. 60 You don't have the curtains back?

A. No sir.

Q. 61 Lets talk about this jacket, —you put in some very dangerous evidence against the defendant, by saying she had blood-stains on her jacket,—do you know they were blood stains?

A. I said they looked like blood stains.

Q. 62 How large were they, Mr. Clark?

A. They were small,—

Q. 63 Pin point weren't they?

A. No, they were bigger than pin point.

Q. 64 Well, were they as large as a dime?

A. No sir, not as large as a dime.

Q. 65 Were they as large as half a dime?

A. Yes sir,—

Q. 66 Now, Mr. Clark, be sure about it?

A. Yes, they were as large as half a dime.

Q. 67 How many spots were on the jacket?

A. About 3 or 4, scattered,—

Q. 68 Scattered where?

A. Up on the right side of the tail of the coat.

Q. 69 Were there any on the back?

A. I didn't see any.

Q. 70 Mr. Clark, where is that jacket today?

A. At the FBI Lab in Washington.

Q. 71 Why didn't you make it available here for us so that the jury could see those spots on that jacket and determine if it was blood?

A. They just didn't send it back.

Q. 72 Have you had any reports that that was human blood on that jacket?

A. No, not at this time.

Q. 73 But you don't know what was on that jacket do you?

A. No, just what it looks like,—

Q. 74 Well, we don't want your opinion, we want to know if you know what was on that jacket,—

GEN. SMITH: We are going to object to a question like this,—he can give his opinion,—

THE COURT: I think his opinion is all he could give,—

MR. MADDOX: I asked him if he knew,—

THE COURT: He can ask him whether he knows or not, he can state, —the only way he would know would be proof of what he actually saw,—

Q. 75 Do you know if that was blood stains or not?

A. Not through a chemical analysis I wouldn't know,—

Q. 76 So you do not know?

A. No sir, I don't.

Later in the trial, Attorney General Williams himself questioned another law officer who had participated in the investigation, and the following testimony was given:

Q. 6 All right, just describe this jacket that Onie Lee was wearing?

A. There was blood spots on the right side of the jacket.

Q. 7 They appeared to be blood stains to you?

A. Yes sir.

Mrs. Hilliard testified on her own behalf to the effect that if there was any blood on her jacket, it was hog blood and not human blood.

Mrs. Hilliard was convicted of second degree murder and sentenced to twenty

years' imprisonment. On April 15, 1971, the Tennessee Court of Criminal Appeals reversed the conviction on the grounds that the evidence was "unconvincing" and insufficient to support the verdict and that some gruesome photographs of the victim had been exhibited to the jury. Hilliard v. State, No. 3 (Tenn. Crim.App., Apr. 15, 1971, unreported). Although the court did not pass on the propriety of withholding the F.B.I. laboratory report, it did discuss the effect of the testimony about the stains on Mrs. Hilliard's jacket:

"Of quite devastating impact tending to show guilt was the fact that the defendant had what appeared to be blood stains on her jacket. The State introduced proof of this, and then it was revealed that the jacket itself had been sent to the F.B.I. laboratory in Washington D. C. for chemical analysis and, although some three months had passed since the jacket had been taken from the defendant, it had not been returned for use at the trial; nor was there any information available to shed light on the vital issue of whether the blood was human as theorized by the State or hog as theorized by Mrs. Hilliard.

"Although, as aforesaid, no opportunity was allowed the trial court to correct any error that might have been involved in allowing the State's proof concerning the blood being on the jacket when it developed that the jacket itself was, by State action, unavailable, and thus we cannot consider the propriety of the court's rulings on the objections made during trial; the impact of this testimony does enter into our decision. The proof offered by the State relative to this blood was circumstantial as was all the other. But here there was an opportunity to make available to the jury direct proof, in the face of the defendant's testimony that the blood was that of a hog, that would have supported one theory and discredited the other. Either the blood was human or swine.

If it had been established as human, this would have left little room for doubt that the defendant was not telling the truth in her explanation of how she got blood on her clothing. If it developed that the blood was from a hog, this would have proved conclusively that she was telling the truth, in this particular at least.

"Certainly the two hypotheses suggested by the proof of blood on the jacket—one tending strongly to suggest guilt, the other tending to support the theory of the defendant—are equally reasonable. In its present condition the evidence offered by the defendant buttressed by the presumption of innocence never overcome by sufficient proof preponderates against the verdict."

Mrs. Hilliard was retried and acquitted in May 1971, having served about one year in the penitentiary. At the second trial she had the benefit of the F.B.I. report, which was duly admitted into evidence.

Mrs. Hilliard filed her complaint in the District Court on May 11, 1971, essentially alleging the facts as outlined above. Initially, the court granted defendant Williams' motion to dismiss on the basis of quasi-judicial immunity. In an earlier appeal, we reversed the dismissal and remanded for trial, holding that the complaint charged Attorney General Williams with acts that were "outside his quasi-judicial capacity and beyond the scope of 'duties constituting an integral part of the judicial process.'" Hilliard v. Williams, 465 F.2d 1212, 1218 (6th Cir.), cert. denied, 409 U.S. 1029, 93 S.Ct. 461, 34 L.Ed.2d 322 (1972).

On remand, the District Court conducted a nonjury trial and set forth findings of fact and conclusions of law in an unreported memorandum opinion. In essence, the District Court found that Williams acted "unwisely and improperly" in failing to disclose the substance of the exculpatory F.B.I. report. The court apparently also held that Agent Clark did not fully discharge his duty to refrain

from giving evasive or misleading testimony. Nevertheless, the court concluded that the defendants' conduct had not deprived Mrs. Hilliard of her constitutional rights and that it had not been shown that the defendants' acts were the direct and proximate cause of Mrs. Hilliard's conviction and incarceration. Despite its conclusions, the court awarded nominal damages of $1.00 against each defendant and taxed costs against Williams.

All of the parties now appeal from the judgment of the District Court. Plaintiff argues that she is entitled to more than nominal damages. Defendants insist that in view of the District Court's finding that plaintiff was not deprived of her constitutional rights, even a nominal award is unwarranted.

■ After a review of the record, we are unable to agree with several of the court's conclusions of law. In Conclusion No. 4, the District Court stated that Attorney General Williams "advised Donn Clark not to mention the report at the first criminal trial unless specifically called for, and thus, we conclude that Clark acted under 'advice' of Counsel, Williams." It is unclear to us whether the District Court viewed Clark's reliance on Williams' advice as an effective defense in this civil rights action. Nevertheless, we think it plain that a law enforcement officer who knowingly gives evasive, misleading, and deceptive testimony during a criminal trial cannot escape civil liability that otherwise would attach merely because the prosecuting attorney instructed him to testify as he did. As the District Court pointed out, Clark was under an affirmative duty to refrain from giving evasive or misleading testimony, and the duty did not disappear when Williams advised Clark to avoid mention of the F.B.I. report.

■ In Conclusion No. 7, the District Court made the following statement:

7. Neither of the defendants jointly or severally suppressed any evidence, committed or suborned perjury, or otherwise committed any act or were guilty of any omission which deprived Mrs. Hilliard of any rights guaranteed her by the Constitution of the United States or any Federal statute.

We do not agree with the court's holding on this aspect of the case. Whether guilty or innocent, Mrs. Hilliard had a due process right to a fair trial. Defendant Williams withheld an F.B.I. report indicating that there was no blood on Mrs. Hilliard's jacket. Moreover, Williams failed to prevent or to correct deceptive and misleading testimony given by defendant Clark from which the jury could have concluded that the jacket was stained with the victim's blood. Further, it appears that Williams actually instructed Clark to testify at least evasively, if not falsely. We believe that by these acts and omissions defendant Williams deprived Mrs. Hilliard of her constitutional right to a fair trial. Miller v. Pate, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967). See Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). It follows that this defendant's conduct also amounted to an actionable violation of 42 U.S.C. § 1983.

■ We hold that the acts and omissions of defendant Clark as outlined above also resulted in depriving Mrs. Hilliard of due process and her constitutional right to a fair trial, under Brady v. Maryland, *supra*. See also United States ex rel. Moore v. Koelzer, 457 F.2d 892 (3d Cir. 1972); Kauffman v. Moss, 420 F.2d 1270 (3d Cir.), cert. denied, 400 U.S. 846, 91 S.Ct. 93, 27 L.Ed.2d 84 (1970).

As an agent of the Tennessee Bureau of Criminal Identification, Clark was assigned to investigate the murder for which Mrs. Hilliard was convicted at her first trial and acquitted at her second trial. It was he who sent the jacket and curtain to the F.B.I. laboratory for analysis of the suspected blood stains, and later sent them back to Nashville to be forwarded to the F.B.I. for further anal-

ysis. In his testimony before the jury he violated his duty to give the complete truth and to avoid deceptive or misleading statements. Although Williams, the District Attorney General, was the official representative of the State of Tennessee in the prosecution of the case, Clark also played an active role in the prosecution.

In *Brady*, the Supreme Court said:

We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." 373 U.S. at 87, 83 S.Ct. at 1196.

Clark relies upon Bryant v. Kentucky, 490 F.2d 1273 (6th Cir. 1974), and Hurlburt v. Graham, 323 F.2d 723 (6th Cir. 1963). We are of the view that there are significant distinguishing features between those decisions and the facts of the case at bar.

■■ We hold that the conduct of Clark also amounted to an actionable violation of 42 U.S.C. § 1983. *Cf.* Jones v. Perrigan, 459 F.2d 81 (6th Cir. 1972).

In conclusion No. 13, the following statement appears:

13. During the proceedings in question defendant Williams was acting within the scope of his duties as Attorney General and at no time did he go outside the scope of his duties as Attorney General in directing or com-

manding or ordering the investigating officers or witnesses to present false testimony.

This conclusion is plainly untenable. It is most emphatically not within the scope of a prosecuting attorney's duties to withhold exculpatory evidence and to direct witnesses to give misleading and deceptive testimony. Hilliard v. Williams, 465 F.2d 1212 (6th Cir.), cert. denied, 409 U.S. 1029, 93 S.Ct. 461, 34 L.Ed.2d 322 (1972); *see* ABA Code of Professional Responsibility, EC 7–13, DR 7–103(B). The function of a criminal trial is to discover the truth, and to that end it is the prosecutor's duty to reveal pertinent information, not to hide it. Brady v. Maryland, *supra*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■■ As the foregoing discussion indicates, we believe that defendants Williams and Clark violated § 1983, for which Mrs. Hilliard is entitled to recover damages. *See* Magnett v. Pelletier, 488 F.2d 33 (1st Cir. 1973); Basista v. Weir, 340 F.2d 74, 87 (3d Cir. 1965); Sexton v. Gibbs, 327 F.Supp. 134, 142 (N.D.Tex. 1970), aff'd, 446 F.2d 904 (5th Cir. 1971), cert. denied, 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1972). The complaint, however, prayed for both punitive and compensatory damages. The award of punitive damages is a matter within the discretion of the trier of fact, and the scope of appellate review is accordingly narrow. *See* Stolberg v. Board of Trustees, 474 F.2d 485, 489 (2d Cir. 1973); Donahue v. Staunton, 471 F.2d 475, 482 (7th Cir. 1972), cert. denied, 410 U.S. 955, 93 S.Ct. 1419, 35 L.Ed.2d 687 (1973); Lee v. Southern Home Sites Corp., 429 F.2d 290, 294 (5th Cir. 1970). In this case we see no basis for disturbing the District Court's refusal to award punitive damages.

■ A more difficult question is presented by the lower court's failure to grant compensatory damages. The court concluded that Mrs. Hilliard had not shown a sufficient causal connection between the defendants' improper acts and her murder conviction and subsequent

incarceration. In Conclusion No. 8, the District Court made the following statement:

> 8. It would amount to speculation and surmise for the Court to conclude that the absence (whether deliberate or otherwise) of the F.B.I. report of March 26, 1970, or the absence of the curtains and jacket, affected the outcome of the May, 1970, trial. There was considerable evidence to warrant a finding of guilty on the record in any event.

To the same effect is Conclusion No. 12:

> 12. Plaintiff has failed to show that any wrongful act of Clark or of Williams proximately and directly caused Mrs. Hilliard to be convicted of murder in the second degree at the May, 1970 trial or to suffer imprisonment on that account in view of other substantial variances in the proof adduced at the two trials.

Further, the District Court stated that the award of nominal damages was made despite "the failure to show that such mistaken or improper acts as and if involved on the part of either defendant were a direct and proximate cause of any imprisonment or damages."

In our opinion, Mrs. Hilliard has shown by a preponderance of the evidence that Attorney General Williams' and T.B.I. Agent Clark's wrongful acts and omissions were a proximate cause and a cause in fact of her conviction and imprisonment pursuant to her conviction. Proximate cause, which must be distinguished from factual causation, frequently becomes an issue in negligence actions and usually is analyzed in terms of the foreseeability of the injury that actually occurred. *See* Lancaster v. Montesi, 216 Tenn. 50, 390 S.W.2d 217 (1965). *See generally* W. Prosser, Torts 244–90 (4th ed. 1971). Assuming the concept is applicable to this case, we believe that it presents no problem. Mrs. Hilliard's conviction and confinement were not only foreseeable consequences of the defendants' conduct, they were without doubt also the intended results.

It appears that this case really turns upon the issue of causation in fact. We therefore are faced with the question of whether Mrs. Hilliard sustained her burden of proving it to be more likely than not that Attorney General Williams' and T.B.I. Agent Clark's conduct was a substantial factor and a material element in bringing about her conviction and imprisonment. *See* Lancaster v. Montesi, 216 Tenn. 50, 390 S.W.2d 217 (1965); Carney v. Goodman, 38 Tenn.App. 55, 270 S.W.2d 572 (1954); W. Prosser, Torts 239–41 (4th ed. 1971). The District Court treated the question as one of law and answered it in the negative. We disagree.

As the Tennessee Court of Criminal Appeals noted, the testimony about blood on Mrs. Hilliard's jacket was "[o]f quite devastating impact." Such evidence would have been highly significant to a jury presented with a violent crime involving axe and shotgun wounds. Furthermore, the other evidence presented against Mrs. Hilliard was wholly circumstantial and sufficiently unconvincing that it could not sustain a verdict of guilty under Tennessee law. It is also important that at the second criminal trial, when Mrs. Hilliard had the benefit of the exculpatory F.B.I. report, she was found not guilty. There were, to be sure, other differences between the two trials, and thus the subsequent acquittal in and of itself does not foreclose the causation issue in Mrs. Hilliard's favor. Nevertheless, the acquittal upon retrial is probative evidence tending to establish that Attorney General Williams' and T.B.I. Agent Clark's conduct was a cause in fact of Mrs. Hilliard's injuries.

No one can ever be certain that Hilliard would not have been convicted if defendants had acted properly in all respects. The law, however, does not place such a heavy burden on the plaintiff. This is a civil case, and plaintiff need only show by a preponderance of the evidence that defendants' conduct was a substantial factor in bringing about the injuries suffered. We are convinced that Mrs. Hilliard has met this burden.

On remand, the District Court should determine the amount of compensatory damages to which Mrs. Hilliard is entitled as a result of her conviction and one-year confinement in prison. This does not include imprisonment prior to conviction.

The judgment of the District Court is reversed and the case is remanded for further proceedings consistent with this opinion.

The Supreme Court has granted certiorari in Imbler v. Pachtman, 500 F.2d 1301 (9th Cir. 1974), cert. granted, 420 U.S. 945, 95 S.Ct. 1324, 4 L.Ed.2d 423 (1975). It is suggested that the District Court postpone further proceedings in the present case until after the Supreme Court has announced its decision in *Imbler*.

The costs of this appeal are assessed against John L. Williams and Donn Clark.