Earl CHARLES, Plaintiff-Appellant,

v.

F. W. WADE, Leo B. Ryan and City of
Savannah, Georgia,
Defendants-Appellees.

No. 80–7409.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Jan. 11, 1982.

* Former Fifth Circuit case, Section 9(1) of Public
Law 96–452—October 14, 1980.

Dennis N. Balske, Ira A. Burnim, Montgomery, Ala., for plaintiff-appellant.

James B. Blackburn, Savannah, Ga., for defendants-appellees.

Before MORGAN, RONEY and KRAVITCH, Circuit Judges.

LEWIS R. MORGAN, Circuit Judge:

Appellant Earl Charles had served approximately three and one half years of a sentence for murder when he was released from prison after new evidence was discovered that supported his alibi defense. Following his release, appellant filed an action under 42 U.S.C. § 1983 against the City of Savannah and F. W. Wade, a detective with the Savannah Police Department, alleging that the defendants had concealed and falsified evidence that exculpated him of the crime and had initiated his prosecution without probable cause. At the conclusion of appellant's case, the district judge directed a verdict in favor of the City and, after deliberation, the jury returned a verdict for Wade. Appellant raises three issues on appeal. First, he argues that the district court abused its discretion in denying his motion to depose a person confined in a Florida prison, a witness alleged to be crucial to his case. Second, appellant argues that the court erred in instructing the jury that it could not find in appellant's favor on the basis of Detective Wade's alleged false testimony at appellant's criminal trial. Finally, appellant asserts that the court erred in directing a verdict for the City of Savannah. We agree with appellant's initial argument that the district court abused its discretion in denying his motion to depose and, for this reason, we reverse the court's judgment and remand for a new trial. We see no merit to appellant's second contention and find it unnecessary to address appellant's final argument.

## I.

The parties offer divergent accounts and emphasize different aspects of the facts that led up to appellant's arrest and prosecution. We will briefly summarize the salient facts of the case and will describe in detail only those facts that are necessary to an understanding of the issues on appeal.

On October 3, 1974, Max Rosenstein, the proprietor of a furniture store in Savannah, Georgia, and his son, Fred Rosenstein, were shot and killed during an armed robbery of the store. Myra Rosenstein, Max's wife and Fred's mother, and Macy Corcelius were present in the store when the murders occurred. The Savannah Police Department (hereinafter SPD) immediately began an investigation that led to appellant's indictment for the crimes on November 21, 1974. At that time appellant was confined in the Pasco County Jail near Tampa, Florida on charges unrelated to the Savannah murders. Following a hearing before the Circuit Court of Pasco County on December 9, 1974, the court granted extradition, and appellant was returned to Georgia.

At his criminal trial, appellant introduced the testimony of Robert Zachery, the manager of a service station in Tampa, who testified that appellant had been working at the station on the day of the murders. Appellant also introduced time cards and payment vouchers from the station that verified his employment on October 3. In an effort to contradict appellant's alibi defense, the prosecution elicited testimony from Detective Wade that Robert Zachery had previously told him that appellant was not at work on the day of the murders. The prosecution then called James Nixon, an individual who had been arrested in Florida with appellant, who testified that while he and appellant were confined in the Pasco County Jail appellant confessed to Nixon that he had committed the Savannah murders. The jury evidently believed the prosecution's witnesses, for it returned a verdict finding appellant guilty of murdering the Rosensteins. Appellant was sentenced to death.

In February 1978 appellant through counsel filed a motion for new trial on the basis of newly discovered evidence that a Florida police officer had seen appellant working at the Tampa service station on the day of the murders. The District Attorney for Chatham County, Georgia dispatched his Chief Investigator to check out this new evidence and, after the investigator reported that the evidence was consistent with appellant's alibi, the district attorney ordered that all witnesses be reinterviewed. After the completion of this investigation the district attorney made the decision not to oppose the motion for new trial and not to reprosecute appellant. Appellant was released from custody on July 5, 1978, over three years and seven months after his arrest and incarceration.

On June 20, 1979, appellant filed a complaint seeking damages under 42 U.S.C. § 1983 for violations of his Sixth and Fourteenth Amendment rights and under Georgia law for false imprisonment, malicious arrest, and malicious prosecution. In his initial complaint appellant named as defendants not only Detective Wade and the City of Savannah but also the Chief of the SPD and three other detectives employed by the department. Appellant subsequently voluntarily dismissed all state law claims and all defendants except Detective Wade and the municipality. Appellant made essentially four allegations against these two defendants: (1) that Detective Wade had falsified two eyewitness identifications of appellant, (2) that Wade had persuaded a witness, James Nixon, to testify falsely that appellant had confessed to committing the Savannah murders, offering Nixon his freedom in exchange for this testimony, (3) that Wade had withheld exculpatory evidence from the district attorney, and (4) that Wade had perjured himself at the criminal trial when he testified that appellant's employer had stated that appellant was not at work on the day of the murders.

Our concern here is with three rulings issued by the district court before and during the trial of appellant's civil case. We will discuss each of these issues in turn.

## II.

The first issue is whether the district court abused its discretion in refusing to permit appellant to depose James Nixon, who was then confined in a maximum security prison in Starke, Florida.

At appellant's 1975 criminal trial James Nixon testified for the prosecution that appellant had confessed committing the Savannah murders to him. Nixon also stated that the prosecution had not promised him anything in return for his testimony. However, during the course of discovery for the 1980 civil trial, appellant's counsel found a letter from Detective Wade and another detective with the SPD to the Governor of Florida requesting that James Nixon be released from prison as a reward for his testimony at appellant's criminal trial. Counsel also found a letter from Nixon to Detective Wade suggesting that Nixon expected to be released from prison in return for his testimony.

Prompted by these discoveries, appellant's counsel sent an associate to interview Nixon at the Florida State Prison in November 1979. According to appellant,[1] at this interview Nixon stated that appellant had not confessed any murders to him and that Detective Wade had promised Nixon his freedom in return for his testimony. Appellant's counsel himself traveled to Florida on February 18, 1980 to further interview Nixon and to see if he would be willing to testify by deposition. At this interview Nixon revealed that Detective Wade had supplied him with the details of the murders. Nixon stated that Wade had come to the jail where he was being held

1. This discussion of the letters and Nixon's alleged statements to appellant's counsel is taken from appellant's brief and from the memorandum presented to the district judge supporting appellant's motion to depose Nixon. By denying the motion to depose, the district court

deprived appellant of any opportunity to establish whether Nixon had in fact changed his testimony. Therefore, for the purposes of this opinion, we will assume the truth of appellant's allegations.

and had questioned him about certain statements appellant had made concerning the Savannah murders. Nixon told Wade that appellant had said nothing about any murders but had stated that he had robbed a furniture store in Savannah where he had once worked.[2] Wade then told Nixon that appellant had killed the owners of the furniture store. Nixon, taking Wade's word that appellant had in fact committed the murders, agreed to testify that appellant had confessed the Rosenstein murders to him in exchange for a guarantee that he, Nixon, would be released from prison. Wade agreed, and a bargain was struck.

At the conclusion of the interview, Nixon agreed to give a deposition. The next day, February 15, 1980, appellant's counsel contacted defense counsel to arrange a mutually agreeable time for the deposition. Two days later, on February 25, defense counsel informed appellant's counsel that under Rule 30(a), Fed.R.Civ.P., a court order would have to be obtained before such a deposition could be scheduled. The following day, some six weeks before the trial, appellant's counsel filed a motion seeking to depose James Nixon. Defendants filed a response opposing appellant's motion. On March 4, 1980, the district court denied the motion on the basis that the discovery period had closed.

The Federal Rules of Civil Procedure permit a party to introduce at trial the deposition of a witness if the witness is more than 100 miles from the place of trial or is unable to appear because of imprisonment. Fed.R. Civ.P. 32(a)(3)(B) & (C). The witness James Nixon satisfied both of these conditions: he was incarcerated in a prison located more than 100 miles from Savannah. Nevertheless, appellant was not automatically entitled to depose the witness since, under Rule 30(a), "[t]he deposition of a person confined in prison may be taken only by leave of court on such terms as the court prescribes."

When appellant sought the court's leave to depose Nixon, the court denied permission on the basis that the discovery period had closed. This was clearly an inappropriate reason for denying appellant's motion to depose. Although the discovery period had indeed closed at the time appellant made his motion, the requested deposition would not have been taken for purposes of discovery but as the testimony of a witness unavailable for trial. Appellant's motion underscored this distinction by informing the court that the deposition would "not be taken for discovery purposes, but in lieu of Mr. Nixon's live testimony at trial." The distinction is a valid one. Appellant was not seeking to discover Nixon's testimony—appellant knew what Nixon had to say—but was seeking a means for introducing Nixon's testimony at trial. A party to a lawsuit obviously is entitled to present his witnesses. The fact that the discovery period had closed had no bearing on appellant's need, or his right, to have the jury hear Nixon's testimony. We hold that the court clearly erred in denying appellant's deposition motion on the ground stated in its order.

■ Appellees point out that had the court allowed Nixon to testify by deposition that appellant had never mentioned the Savannah murders, appellees would have immediately impeached this testimony by introducing Nixon's many previous statements that appellant had confessed the murders to him. Appellees also emphasize that appellant offered no corroboration of Nixon's alleged testimony. Neither argument provides a justification for excluding Nixon's testimony. Whether Nixon's previous inconsistent statements or the absence of any corroborative evidence undercut the value of his deposition testimony was a question for the jury, not for the court. By denying appellant the right to depose Nixon, the court in effect deprived the jury of any opportunity to make this credibility judgment. The court offered no valid reason for denying the jury access to Nixon's testimony, and appellees have failed to provide one here.

**2.** Appellant states in his brief that he never worked at Rosenstein's furniture store.

Finally, we note that permitting the deposition to be taken would not have prejudiced appellees in any way. Appellant filed his motion more than six weeks prior to trial, and therefore appellees had ample time to select a convenient date and to prepare for the deposition. At oral argument appellees suggested that if the court had allowed the deposition, they would have required additional time to round up the witnesses they would have needed to refute Nixon's testimony. Appellees never made this argument to the district court. Even if they had, the appropriate remedy would have been to postpone the trial, not deny the deposition and deprive appellant of testimony critical to his case.

### III.

■ The next issue for our consideration is whether the district court erred in instructing the jury that it could not premise liability on Detective Wade's alleged false testimony at appellant's murder trial. The basis for the court's instruction was its conclusion that a police officer who testifies as a witness in a judicial proceeding should be accorded absolute immunity from a civil damages suit brought under 42 U.S.C. § 1983. The question of witness immunity under § 1983 is one of first impression in this circuit. After carefully considering the precedents and the policies supporting witness immunity, we adopt the majority position that a witness is entitled to absolute, unqualified immunity from liability under § 1983 for his trial testimony. We therefore affirm the district court's ruling on this question.

The appropriate analysis for evaluating an immunity defense to a § 1983 "constitutional tort" action was outlined by the Supreme Court in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). There, in considering the scope of a state prosecutor's liability under § 1983 for an alleged unlawful prosecution of a criminal defendant, the Court recognized that it had previously established that "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Id.* at 418, 96 S.Ct. at 989. From this basic premise the Court devised a two-part test for determining the validity of an immunity defense. First, the court must inquire into the immunity historically accorded the claimant at common law and the interests behind it. *Id.* at 421, 96 S.Ct. at 990. Next the court must determine whether the considerations of public policy that underlie the common law rule likewise countenance absolute immunity from § 1983 liability. *Id.* at 424, 96 S.Ct. at 992. Utilizing this analysis, the Court held that a state prosecutor enjoys an absolute immunity from liability under § 1983, even though such immunity leaves the genuinely wronged defendant with no civil redress against a prosecutor who knowingly used perjured testimony or deliberately withheld exculpatory information. The Court's holding was consistent with its previous cases extending absolute immunity to legislators, *Tenney v. Brandhove*, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), and to judges, *Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and was consistent with the cases granting a qualified immunity to policemen, *Pierson v. Ray, supra*, and to school officials, *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). In each of these cases the Court had adopted essentially the same immunity under § 1983 that had prevailed at common law.[3]

---

3. The result of the Court in one case, *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), may be viewed as a departure from the common law, although it did not so state. In holding high executive officials subject to qualified immunity, *Scheuer* may have been a withdrawal from the absolute immunity at federal common law of *Barr v. Mateo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959), and *Spalding v. Vilas*, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1886). But even that federal common law was of relatively recent origin compared to the legislative and judicial immunities with roots in the seventeenth century: "The [absolute] executive privilege in defamation actions would appear to be a judicial creature of less than 65 years' existence." *Barr v. Mateo*, 360 U.S. 564, 582, 79 S.Ct. 1335, 1345, 3 L.Ed.2d 1434 (1959) (Warren, C. J., dissenting opinion). [The majority] highlights *Scheuer v. Rhodes, supra*, as showing how

It is clear that at common law a witness was absolutely protected from any suit arising from his testimony in a judicial proceeding, *Myers v. Bull*, 599 F.2d 863, 866 (8th Cir. 1979), *cert. denied*, 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d 138 (1980); *Brawer v. Horowitz*, 535 F.2d 830, 837 (3d Cir. 1976), even if his testimony was perjured and malicious. 1 F. Harper & F. James, The Law of Torts, § 5.22 at 423–24 (1956); W. Prosser, The Law of Torts, § 114 at 777 (4th ed. 1971). The witness' immunity—like the immunity accorded to judges and prosecutors—was based upon his status as an essential participant in the judicial process:

> The function of witnesses is fundamental to the administration of justice. The court's judgment is based on their testimony and they are given every encouragement to make a full disclosure of all pertinent information within their knowledge.

1 Harper & James, *supra* at 424. The common law perceived that the policy of encouraging a witness' free and uninhibited cooperation in the fact-finding process would best be served by insulating the witness from the threat of civil liability for his testimony. Without such immunity, the witness might gauge each of his statements in terms of the possibility of his own personal liability and, therefore, lack the candor and freedom of expression considered essential to the proper functioning of the judicial process. *See* Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L.Rev. 463, 469 (1909). The resulting lack of any civil remedy against the dishonest witness "is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for they say." Prosser, *supra* at 778.

A majority of federal appeals courts to consider the question have held that the policies that underlie the common law rule of absolute witness immunity apply with equal force in a § 1983 action or its counterpart, a *Bivens*-type claim.[4] *Briscoe v. LaHue*, 663 F.2d 713 (7th Cir. 1981); *Myers v. Bull*, 599 F.2d 863 (8th Cir. 1979), *cert. denied*, 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d 138 (1980); *Burke v. Miller*, 580 F.2d 108 (4th Cir. 1978), *cert. denied*, 440 U.S. 930, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979); *Blevins v. Ford*, 572 F.2d 1336 (9th Cir. 1978); *Bennett v. Passic*, 545 F.2d 1260 (10th Cir. 1976). *Contra, Briggs v. Goodwin*, 569 F.2d 10 (1977), *cert. denied*, 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *Hilliard v. Williams*, 516 F.2d 1344 (6th Cir. 1975), *vacated on other grounds*, 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976), *on remand*, 540 F.2d 220 (6th Cir. 1976). We agree with the majority position. No one can doubt that the need for full disclosure and free expression by witnesses is as important in a § 1983 "constitutional tort" action as in a suit at common law. Because the witness plays such an integral role in the fact-finding process, the reluctant or reticent witness would disserve the ends of justice regardless of the nature of the proceeding. Furthermore, it seems obvious that the prospect of personal liability under a civil rights claim would pose the same risk of intimidation as would the possibility of liability under the common law. It is the threat of money damages that produces the intimidating effect, and that threat is present under either theory of liability. Consequently, the policies underlying the common law rule of absolute immunity also justify providing a witness with immunity from § 1983 liability.

 We wish to emphasize that the immunity granted to witnesses—whether

---

the Supreme Court departs from the immunities of the common law when a constitutional right is involved. In fact, as noted, *Scheuer* is the only Supreme Court case that does so, (without expressly acknowledging it either), and, moreover, as noted, that common law was of recent origin.
*Briggs v. Goodwin, supra*, 569 F.2d 10 at 50 (Wilkey, J., dissenting).

4. *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *Bivens* creates a cause of action against federal officials who act under color of their authority to deprive an individual of his constitutional rights. Section 1983 applies only to those officials who act under color of *state* law.

under the common law or under § 1983—is not designed to benefit the dishonest witness but to further the broad public interest in having witnesses who are unafraid to testify fully and openly. As Judge Learned Hand remarked in discussing a prosecutor's immunity,

> [a]s is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Gregoire v. Biddle,* 177 F.2d 579, 581 (2nd Cir. 1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), *quoted approvingly in Imbler v. Pachtman, supra,* 424 U.S. at 428, 96 S.Ct. at 994. The protection accorded to the dishonest witness is simply a necessary consequence of a rule deemed essential to maintaining the integrity of the judicial process. Moreover, granting immunity from § 1983 liability does not provide witnesses with a license to testify falsely or "leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law." *Imbler v. Pachtman, supra,* 424 U.S. at 429, 96 S.Ct. at 994. The witness who lies on the stand may be prosecuted for perjury. *Brawer v. Horowitz, supra,* 535 F.2d at 837. This threat of criminal sanctions provides a sufficient deterrent against abuse of the witness privilege. *Burke v. Miller, supra,* 580 F.2d at 111. "[I]f the risk of having to defend a civil damage suit is added to the deterrent against such conduct already provided by criminal laws against perjury and subornation of perjury, the risk of self-censorship becomes too great." *Imbler v. Pachtman, supra,* 424 U.S. at 439–40, 96 S.Ct. at 999 (White, J., concurring).

### IV.

[6] Finally, appellant argues that the district court erred when it directed a verdict in favor of the City of Savannah. In Part II of this opinion we held that the district court abused its discretion in denying appellant's motion to depose a person confined in a Florida prison. As a result of the court's error in refusing to permit the requested deposition, the court ruled on the City's motion for directed verdict without first having heard all the appellant's evidence. The possibility exists, therefore, that once the excluded deposition evidence is admitted at trial, the court could be persuaded to reach a different result on the directed verdict issue. Because the district court must be given an opportunity to reconsider its ruling in the light of the additional evidence presented by appellant, we find it unnecessary to express any opinion on the propriety of the court's earlier decision to grant the motion for directed verdict.

### V.

Because we find that the district court abused its discretion in denying appellant's motion to depose a person confined in a Florida prison, we reverse the court's judgment and remand for a new trial. Following the introduction of appellant's evidence, including the deposition testimony of James Nixon, the court should reconsider its order directing a verdict for the City of Savannah.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

KRAVITCH, Circuit Judge, concurring in part, dissenting in part:

I concur in Parts I, II, IV, and V of the majority opinion. I respectfully dissent, however, from Part III, which holds that in a § 1983 action, a police officer is absolutely immune from liability for testimony given as a witness in the course of his official duties. Instead, I would clothe police officers who testify within the scope of their duties with the good-faith, qualified immunity that they possess for their other official acts.

42 U.S.C. § 1983 provides that every person who acts under color of state law to

deprive another of a federal right shall be liable to the injured person in an action at law, suit in equity, or other proper proceeding for redress. The language of § 1983 is silent with respect to immunities. It has been held, however, that Congress did not intend to eliminate all common law immunities when it enacted § 1983. *E. g., Wood v. Strickland,* 420 U.S. 308, 317, 95 S.Ct. 992, 998, 43 L.Ed.2d 214 (1975); *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); *Clanton v. Orleans Parish School Bd.,* 649 F.2d 1084, 1101 n.20 (5th Cir. 1981). Yet because the extension of absolute immunity from § 1983 liability to state officials negates "pro tanto the very remedy it appears Congress sought to create, ... the [Supreme] Court has not extended *absolute* immunity to such officials in the absence of the most convincing showing that the immunity is necessary." *Imbler v. Pachtman, supra,* 424 U.S. at 434, 96 S.Ct. at 996–97 (White, J., concurring). The Court has granted absolute immunity to state legislators, *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), judges, *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967), and prosecutors, *Imbler v. Pachtman, supra,* in order "to protect the decision-making process in which [the officials] are engaged." *Id.* at 435, 96 S.Ct. at 997.

The Supreme Court has refused, however, to clothe other state officials with absolute immunity, even though their duties require the exercise of much discretion and, in some circumstances, they would have been absolutely immune from liability at common law. *See Imbler v. Pachtman, supra* at 434, 96 S.Ct. at 996–97. Instead, the Court has extended only a good-faith, qualified immunity to school board members, *Wood v. Strickland, supra,* state executive officials, *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), prison officials, *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978), and police officers, *Pierson v. Ray, supra.* The rationale for according these state officials with immunity when they act in good faith and with a reasonable belief that their actions are lawful is to minimize the prospect that

the threat of liability will deter such officials from exercising their discretion and performing their official duties, *Douthit v. Jones,* 619 F.2d 527 (5th Cir. 1980), without totally undermining the purpose of § 1983, which is to provide a remedy to persons deprived of their federal rights by the abuse of official power.

Police officers have been accorded good-faith, qualified immunity from § 1983 liability for actions undertaken within the scope of their duties. *See, e. g., Pierson v. Ray, supra* (§ 1983 suit arising from false arrest and imprisonment); *Barker v. Norman,* 651 F.2d 1107 (5th Cir. 1981) (§ 1983 action based on illegal search, seizure, and retention of property); *Vasquez v. Snow,* 616 F.2d 217 (5th Cir. 1980) (§ 1983 suit premised on illegal search). So long as a police officer performs his duties in good faith and with a reasonable belief that his actions are lawful, *Barker v. Norman, supra,* he is immune from § 1983 liability whether the alleged deprivation arises during the course of an investigation, *Vasquez v. Snow, supra,* arrest, *Pierson v. Ray, supra,* or imprisonment, *id.* Such an immunity should also extend to a police officer who testifies within the scope of his duties. The discretion a police officer exercises in testifying as a witness is certainly no greater than that which he exercises in making an arrest or conducting a search. In fact, it is much less. "[A] witness, at least in theory, exercises no discretion in the performance of his duty to answer fully and truthfully all questions put to him, unless the requested information would be self-incriminating or would violate some other evidentiary privilege." *Briscoe v. LaHue,* 663 F.2d 713, 719 (7th Cir. 1981). Moreover, the adverse impact on the criminal justice system is no greater where the threat of liability inhibits a police officer from fully testifying than where it chills, for example, a police officer's investigative activities or propensity to arrest a suspect. Thus, in my judgment, police officers should not be afforded a greater immunity from liability when they testify at trial than when they engage in their other duties; they should be immune

from § 1983 liability only if they testify in good faith and with a reasonable belief in the truthfulness of their testimony.

At common law, witnesses are afforded absolute immunity in order to free them from the prospect of civil liability, which may dissuade them from coming forward or from fully and freely testifying. The majority concludes that police officers are entitled to absolute immunity from § 1983 liability because the policies underlying absolute witness immunity at common law likewise countenance absolute immunity from § 1983 liability. In so reasoning, the majority has overlooked critical differences between public officials and other witnesses. Public officials, "who in any event face the possibility of liability for most of their official acts, who may be obligated to testify as an aspect of their official duties, and who are normally represented by government counsel in § 1983 actions," *Briscoe v. La-Hue, supra,* are likely to be less intimidated than private citizens by the threat of a § 1983 action. Thus, the policy considerations that countenance absolute immunity for lay witnesses at common law do not apply with equal force in the context of a § 1983 action against a police official who testifies within the scope of his duties. *Briggs v. Goodwin,* 569 F.2d 10, 18 (D.C.Cir. 1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978); *Burke v. Miller,* 580 F.2d 108, 112 (4th Cir. 1978) (Winter, J., concurring). *See Hilliard v. Williams,* 516 F.2d 1344, 1349 (6th Cir. 1975), *vacated on other grounds,* 424 U.S. 961, 96 S.Ct. 1453, 47 L.Ed.2d 729 (1976), *affirmed after remand,* 540 F.2d 220 (6th Cir. 1976) (police officer liable under § 1983 for falsely testifying in a criminal trial).

One may argue that if we deny public officials absolute witness immunity from § 1983 liability, then we likewise must deny private citizens absolute witness immunity. *See Briscoe v. LaHue, supra.* Such is not the case. Private parties possess absolute witness immunity from § 1983 liability because the policies underlying common law witness immunity equally justify absolute immunity for private parties in the § 1983 context. Moreover, according different degrees of immunity to parties subject to § 1983 liability is nothing new. For example, in the nonwitness context public officials acting within the scope of their duties possess either an absolute or qualified immunity from § 1983 liability, while private parties who have conspired with the same officials to interfere with an individual's federal rights generally possess no immunity at all. *See Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980).

For the reasons given, I agree with the District of Columbia and Sixth Circuits and would hold that a public official, here a police officer, who testifies at trial within the scope of his duties possesses only a good-faith, qualified immunity from § 1983 liability.