**Robert T. DALE, Plaintiff,**

v.

**John BARTELS, et al., Defendants.**

**No. 74 Civ. 1382–CLB.**

United States District Court,
S.D. New York.

Dec. 17, 1982.

H. Miles Jaffe of Norwick, Raggio, Jaffe & Kayser, New York City, for plaintiff.

William Hibsher, Asst. U.S. Atty., New York City, for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

In this ancient *Bivens* type civil rights action, filed March 19, 1974, there has been pending since December 22, 1981 a motion by all those defendants actually served and appearing, to dismiss the complaint for failure to state a claim, or alternatively, for summary judgment. Joined with *Bivens* allegations of constitutional violations by agents of the Bureau of Narcotics and Dangerous Drugs ("BNDD", now Drug Enforcement Agency) are pendent claims under state law for false arrest and defamation.

The sole remaining plaintiff, Robert T. Dale (hereinafter "Dr. Dale") was a physician. In 1971–72 together with his wife he operated a methadone clinic in New York City. Following an audit of the clinic records by agents of the BNDD, plaintiff closed his clinic and fled to Europe.

On February 14, 1973, a Grand Jury in this district returned an indictment against Dr. Dale and another, under docket number 73 Cr. 163, charging Dr. Dale with one count of violation of 21 U.S.C. §§ 812, 827 and 843 by furnishing false and fraudulent information in records of a controlled substance dispensed, and two counts for making false statements to federal agents in violation of 18 U.S.C. § 1001. For reasons which need not concern us, this indictment never proceeded to trial on the merits. Leave was granted to the Government by Judge Stewart of this Court on March 4, 1974 to file an order *nolle prosequi,* and that was done.

This Court's consideration of the summary judgment motion was of necessity deferred in order to permit access by plaintiff's attorney and also by the defendants' attorney and this Court, to the grand jury testimony of the defendant Steinberg, at relevant times an agent of the BNDD. Following limited release of Steinberg's testimony to the grand jury, discussed below, and further argument, the Court has now taken the entire motion as fully submitted for decision. Familiarity is assumed with respect to all prior proceedings, including this Court's decision in *Dale v. Bartels,* 532 F.Supp. 973 (S.D.N.Y.1982), requiring disclosure of the grand jury minutes under a protective order.

The complaint herein, familiarity with which is assumed, pleads some thirteen separate claims or "causes of action." Mrs. Lily Farley Ross Dale, wife of Robert T. Dale, and Ross Tatum Dale, their child, are no longer parties to the action. The remaining plaintiff, Robert T. Dale, at relevant times was a licensed physician, registered with federal authorities to dispense methadone at a clinic which he operated in New York City.

Defendant John Bartels was the Administrator of BNDD between July 1, 1973 and May 30, 1975. On the latter date he returned to civilian life. The remaining defendants were all agents of the BNDD. Their individual participation is discussed below.

From about February 28, 1971 until about October 1st of that year, Dr. Dale operated a methadone maintenance out-patient program for the detoxification and treatment of heroin addicts, at 740 West End Avenue in this City. On the latter date he removed the clinic to 249 West 30th Street and operated at that location until about July 13, 1972, when, under circumstances detailed below, he closed the clinic and fled to Europe.

Acting pursuant to the "Comprehensive Drug Abuse Prevention and Control Act" of 1970, 21 U.S.C. § 801, et seq. the BNDD on June 9, 1972 commenced an administrative audit of the dispensing records of the Dale Clinic with respect to methadone. Defendant James Steinberg was in charge of the audit, which was authorized by the aforementioned statute and regulations adopted thereunder, and conducted pursuant to an administrative warrant for an "establishment inspection" issued by Hon. Harold J. Raby, a United States Magistrate of this district. See 21 U.S.C. § 880. A sufficient factual basis existed for the warrant, which sought to reconcile the methadone dosages purchased with those dispensed during the

audit period, adjusting for opening and closing inventories. According to the results of the audit, completed on July 13, 1972, the Clinic, having a caseload of about 1100 patients, had dispensed approximately 54,660 dosage units or diskets of methadone for which it had no record. Dr. Dale disputed this factual contention at the time, and claimed during the audit that the agents insisted on looking at the wrong records. He also alleged that the audit was characterized by harassment and intimidation, conducted in an unreasonable manner and in bad faith, and was "overlong and unnecessarily disruptive" (Complaint, ¶ 14). The complaint alleges that a later warrant, resulting in a search of the clinic premises on or about July 17, 1972 was issued without probable cause and also resulted in a seizure of items not within its scope. It is also pleaded that "unknown agents of BNDD" turned over clinic [patient] records to one Dr. Alan Kaye, a non-party private physician, who apparently also operated a methadone clinic (Complaint ¶ 17). In the Sixth and Seventh claims pleaded, unknown persons are accused of seizing records of the clinic, and arresting Dr. Dale in an unauthorized fashion. In the Eighth claim it is said that defendant Steinberg and others entered plaintiff's apartment, abused his parents and converted money and "certain other items" (Complaint ¶ 20).

The complaint continues, to allege that defendant Steinberg caused an arrest warrant and complaint to be issued against the plaintiff by making "false and malicious statements" leading to his arrest in Denmark in January 1973.

We defer momentarily, our discussion of the Tenth claim pleaded, because there are found the allegations giving greatest concern to this Court in passing upon the summary judgment motion.

In the Eleventh claim the pleader repeats all prior allegations as "taken together a pattern of harassment and intentional violations of plaintiff['s] constitutional rights which is in itself a violation of the Fourth and Fifth Amendments, and which represents part of a pattern of conduct of BNDD

agents and officers by which American citizens have been unlawfully harassed, intimidated, disgraced and killed." (Complaint, ¶ 24).

There follows two pendent state law tort claims; for false arrest and for defamation.

The prayer for relief, framed as it was before Dr. Dale's wife and son dropped their claims, sought both legal and equitable relief as follows:

"WHEREFORE, plaintiffs respectfully request that this Court:

1. Grant judgment against defendants in compensation for the damages suffered by them, in the amount of at least $3,500,000.

2. Grant judgment against defendants for punitive and exemplary damages because of their willful and malicious conduct in the amount of at least $1,000,000.

3. Award plaintiffs the costs of this action including a reasonable attorney's fee.

4. Issue injunctions ordering defendants to cease and desist from all illegal activities of the sort alleged above, *and ordering John Bartels, Director of the BNDD, to cause to be issued public statements of apology and, on request, statements confirming that plaintiffs were wrongly accused in the above-mentioned indictment.* (Emphasis added).

5. Retain jurisdiction to issue orders to all relevant federal officers to take all appropriate actions on any application filed by plaintiffs for permission to function within their fields of expertise.

6. Grant such other relief as the interests of justice require."

Of course this Court lacks the power to cause bureaucrats to issue public apologies for the allegedly excessive zeal or incompetence of their subordinates. And there is no basis for a Court to require a certificate of good conduct or a statement of "wrongly accused" to be issued by the Executive Branch of Government, especially where, as here, an indictment, the wrongness of which is sought to be confirmed, was never tried to a jury on the merits. Were it otherwise, our Court would truly be

overwhelmed with suitors, and this even were we to limit ourselves to those cases where an apology would clearly be appropriate. This relief sought of Bartels is essentially frivolous. Accordingly, and because his dates of service in the office do not include the relevant time period of the rest of the claims (see *supra*, pp. 1256–1257) it is clear that defendant Bartels is entitled to summary judgment in his favor.

The proof submitted on this motion shows without question that plaintiff closed his clinic and fled the country prior to receipt of the customary ten (10) day letter from the Food and Drug Administration revoking his authority to dispense methadone. While perhaps an argument can be made concerning the clinic's accountability records, or more particularly, concerning whether any improprieties were wilful, the record as a whole, amplified by pre-trial discovery and depositions, as well as affidavits, shows that there was an accountability problem, there was probable cause for the audit or inspection warrant and also for the search warrant.

All persons having knowledge deny that unauthorized objects were seized pursuant to the search warrant, and there is no competent evidence to the contrary.

The transfer of patient records to Dr. Kaye was not effected by these defendants sued here.

Similarly there is no evidence of theft of personal property or money from the Dale apartment by any defendant sued here. The arrest was lawful, and defendant was released to the custody of his attorney without even being held overnight. There was nothing improper about handcuffing plaintiff. There is no evidence that defendants sued here were those who notified the press of Dr. Dale's arrest; even if they did, the Court believes that the public has a legitimate interest in the enforcement of the narcotics laws and has the right to have the press know of the arrest of a prominent professional whose indictment is under consideration. A returning fugitive has no civil right to a voluntary surrender in lieu of being arrested.

We assume for purposes of our argument the allegations by plaintiff to the effect that the audit of the clinic's methadone dispensing records was negligently done, and that the agents were hostile. Undisputed affidavits suggest Dr. Dale was hostile also. The dispensing of controlled substances is a proper subject for audit by the employees of the federal agency. It is understandable, and non-actionable, that the social atmosphere of an afternoon tea party may not prevail at such an audit. Plaintiff had adequate due process protections available to him at the agency level, and thereafter, in the courts, if the agency had sought to revoke his dispensing authority without justification. See *Foxman v. Renison*, 625 F.2d 429 (2d Cir.), *cert. denied*, 449 U.S. 993, 101 S.Ct. 530, 66 L.Ed.2d 290 and cases therein cited.

To the extent "harassment" is charged, the facts apparent as a result of extensive discovery even when viewed most favorably to plaintiff, do not reach the level of a constitutional tort. See *Fairchild, Arabatzis & Smith, Inc. v. Sackheim*, 451 F.Supp. 1189, 1192 (S.D.N.Y.), *aff'd.*, 591 F.2d 1330 (2d Cir.1978); *Contemporary Mission, Inc. v. United States Postal Service*, 648 F.2d 97, 105–06 (2d Cir.1981); *Black v. United States*, 534 F.2d 524, 528 (2d Cir. 1976).

The balance of the constitutional tort claims, except for the Tenth Claim, discussed below, are all either insufficient in law, unsupported by credible evidence, or both. The pendent state law claims for defamation do not speak well for the accuracy of the "Bulletin," a house organ of the BNDD, circulating among BNDD agents and affiliated law enforcement personnel. Its 1972–73 winter issue referred to plaintiff and his wife as fugitives and characterized them as "the largest supplier of illicit *amphetamines* on the East Coast." (Emphasis added). This was wrong, as the illicit drug which Dr. Dale was allegedly supplying was methadone, not amphetamines, and he was by no means the largest such

supplier. Later, the house magazine referred to him as "in custody" when he was in fact free on bail. This defamation claim is not actionable in light of *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), decided after this complaint was filed. There is no evidence that defendant Daugherty, one of the unnamed agents sued, and actually appearing in the action, who was the editor of the publication, had any responsibility for this misdescription of plaintiff. In any event, he would be personally immune from liability under state law for defamation committed in the course of his official duties. *Barr v. Mateo,* 360 U.S. 564, 572–76, 79 S.Ct. 1335, 1340–1342, 3 L.Ed.2d 1434 (1959); *Birnbaum v. United States,* 588 F.2d 319, 332 (2d Cir.1978); *Expeditions Unlimited v. Smithsonian Institution,* 566 F.2d 289, 291 (D.C.Cir.1977). The pendent state law false arrest claim also lacks merit. Plaintiff was arrested upon a validly issued warrant, processed, and released immediately. See *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). He was later indicted. See *Garris v. Rowland,* 678 F.2d 1264, 1273, n. 6 (5th Cir.1982).

We turn now to the only part of the motion which presents a close question, that found in the Tenth claim pleaded. Plaintiff's complaint alleges:

"23. By making false and malicious statements to a grand jury, and acting in bad faith, certain unknown defendants caused an indictment to issue against defendants [sic, should read "plaintiffs"] on or about February 16, 1973 charging them with serious and infamous crimes which defendants knew or should have known there was no cause to believe plaintiffs have committed, thus depriving plaintiffs of their right to 'due process of law' guaranteed by the Fifth Amendment."

Defendants sought amplification of this allegation by their Interrogatory 15, which was answered in relevant part as set forth below:

*"Question 15(a):*

With respect to the allegations set forth in Paragraph 23 of the complaint . . .

(a) Identify . . . (ii) the false and malicious statements referred to;

*Answer 15(a):*

\* \* \* \* \* \*

(ii) The grand jury minutes are essential to answering this question. It is plaintiff's belief that Steinberg gave his testimony in such an inaccurate or distorted manner as to mislead the grand jury. For example, he may have testified that Dr. Dale denied that James Richardson was a patient in the program whereas Dr. Dale asserted that he had the patient record of James Richardson.

*Question 15(b):*

State the basis of your contention that the defendants (i) acted in bad faith, (ii) knew or should have known that there was no cause to believe plaintiffs committed the acts alleged;

*Answer 15(b):*

(i) Steinberg knew or should have known that the audit was inaccurate and that the statements made by Dr. Dale for which he was subsequently indicted were not lies but were misunderstandings or mistakes. Again, Steinberg knew or should have known that there was no basis for indicting Dr. Dale on the claims set forth in (a) above.

(ii) Steinberg should have listened to the Dales as to the correct records to use for the audit and should have reviewed the accuracy of the audit after its completion by the agents. Steinberg knew that Dr. Dale's statement to the F.D.A. that there were 788 patients (Second Count of Indictment) was an estimate, not intended to mislead. (Dr. Dale had every reason to exaggerate not to underestimate patients.) Steinberg knew from his conversation with Dale concerning James Richardson (Count Three of Indictment) that Dr. Dale's statement 'no he wasn't' contained in the Government's bill of particulars on the indictment (supposedly denying Richardson's inclusion in the program on the relevant dates) re-

sulted from a Dale mistake, if that, as to the dates of the audit. Dr. and Mrs. Dale made clear in that same discussion (July 13, 1972) that they had the Richardson chart. It was clear that they did not intend to mislead the Federal Agents or lie to them."

The Tenth claim is founded on the grand jury testimony of Steinberg. It therefore became obvious that his grand jury testimony had to be made available to this Court and to counsel for the parties. Although the transcript thereof was in possession of the Criminal Division of the United States Attorney's Office in this district, the Assistant United States Attorney appearing for defendants in this case, assigned to the Civil Division, had never seen it. Also, because he did not go to trial on the Indictment, Dr. Dale had never actually seen the transcript of the grand jury testimony. See 18 U.S.C. § 3500(e)(3). Disclosure was ordered under a protective order in customary form, pursuant to this Court's Memorandum decision and order dated February 26, 1982, which also provided that the motion for summary judgment disposed of herein be held in abeyance pending production thereof, which has been done.

This Court has carefully reviewed the grand jury minutes of defendant Steinberg, then a Special Agent of the BNDD and now serving as a Deacon in the Roman Catholic Church in California. Defendant Steinberg's deposition has also been taken in the action, along with that of the informant Covner, mentioned below.

 Steinberg's grand jury testimony, taken on February 7, 1973, consists of 33 pages of transcript. Some of it is hearsay, clearly tendered as such. Fairly read, it was sufficient to justify and support the indictment which charged plaintiff and his wife with knowingly and wilfully keeping and maintaining false and fraudulent records in violation of 21 U.S.C. §§ 812, 827, 843 and 21 C.F.R. § 301, et seq. (First Count); and charged Dr. Dale with making false statements on or about June 9, 1972 to the BNDD as to the amount of his patient caseload in violation of 18 U.S.C. § 1001

(Second Count); and with violating that same statute on July 13, 1972 when he allegedly:

"In a matter within the jurisdiction of a department and agency of the United States, to wit, the Bureau of Narcotics and Dangerous Drugs, Department of Justice, unlawfully, wilfully and knowingly did make a false, fictitious and fraudulent statement and representation, to wit, that James Richardson was not a patient in the defendant's methadone maintenance treatment program during the period from May 1, 1971 up to and including June 8, 1972, whereas, in truth and in fact, as the defendant then knew, James Richardson was such a patient during said period."

However, the grand jury testimony of defendant Steinberg contained the following:

"Q During the course of that conversation, did you report to him [Dr. Dale] that you had uncovered an instance of deliberate falsification of patient records?

A Yes, we did.

Q What happened? What was the conversation?

\* \* \* \* \* \*

A We told Dr. Dale—this was in light of the serious discrepancies, actually shortages of methadone, that we felt that he had either destroyed or otherwise withheld at least one patient record. We felt there were many, many more. The one patient we were talking about was an individual named James Richardson. James Richardson was a patient of Dr. Dale's very early in June, 1971, for a period of about two weeks.

*We knew beforehand—this is from conversations with at least one counselor—that Dr. Dale had killed Richardson with an overdose of methadone.*

We knew Richardson was a patient because we saw Xerox copies of Richardson's patient records which one of the counselors took, provided us with.

Dale at all times when we were finished completely, you know, reiterated, reiterated that we had seen all the patients' records. We never did see James Richardson's patient's record.

Dale said that it was "An easily provable lie that Richardson was not a patient of his during the accountability period." That's why we never saw it. We know for a fact that Richardson was a patient of his during the accountability period. *We know for a fact that Dale did kill him with methadone because we have the coroner's report stating that Mr. Richardson died of a methadone overdose.*

And one of the counselors by the name of Bruce Covner told me that for the first two weeks that—of June when Richardson was a patient that [Mrs.] Richardson [decedent's mother] kept pleading with Covner and Dr. Dale for Dr. Dale to cut down the amount of methadone that Richardson was on, because he was too high. [It] was acting like heroin, putting him in euphoria. He couldn't function at all.

And Dr. Dale probably on two or three occasions became hysterical and said that no one could tell him how to practice, that he was the doctor. When Richardson died, Covner the counselor was standing right next to Dr. Dale, when Dr. Dale told the medical examiner or the coroner that Richardson died of an overdose of heroin and barbituates, Covner alleged that Dr. Dale was looking right at Richardson's urine report which showed nothing in his system but methadone and in fact lied to the coroner.

And when we got a copy of the autopsy we found the only thing in Richardson's system was methadone. It was neither heroin nor barbituates nor anything else in the system. So that the motivation for Dr. Dale withholding that one patient record is fairly obvious." (Emphasis and matter in brackets added).

Our analysis of the grand jury testimony compels the inescapable conclusion that Dr. Dale was properly indicted for the violations alleged. There was more than enough in the record, not all of it from Steinberg, to satisfy the threshold requirement that the grand jury find probable cause with respect to the crimes charged. Dr. Dale was not charged with "killing" James Richardson. The unfortunate death of Richardson, however, if associated directly or indirectly with Dr. Dale, provided a motive for the violation of 18 U.S.C. § 1001 charged in Counts Two and Three of 73 Crim. 163. The information was also inflammatory.

So much of the testimony about Richardson to the effect that "we have the coroner's report stating that Richardson died of a methadone overdose" was not strictly accurate.

The downstate New York counties no longer have coroners; autopsies are performed by a Medical Examiner, who must be a licensed physician. The autopsy report for Richardson is now before this Court. It shows that the autopsy was conducted June 16, 1971. The patient had been dead on arrival at Harlem Hospital at 5:45 A.M. on June 15, 1971. His age was 25 years. The Examiner, the by now celebrated Michael Baden, M.D., found among other things:

> "Multiple pigmented needle tract (sic) scars are present on both forearms, and a few scatteres (sic) depressed circular subcutaneous scars over both forearms. . . . . There are two circular infected ulcerations on the dorsum of the left foot, surrounded by much erythema. Enlarged and congested lymph nodes were found."

Dr. Baden, the Medical Examiner, subsequently made the following additional official findings:

> "Needle tract (sic) scars of upper extremities prominent; Circular depressed subcutaneous healed infection scars on upper and lower extremities with ulceration of dorsum of left foot and erythema of skin of left lower extremity extending to knee. Hyperplasis of lymph nodes in the left inguinal region. Congestion of lungs. Hyperplasia of the periportal lymph nodes."

The Medical Examiner gave his initial opinion as to "cause of death" as follows:

"Chronic subcutaneous and intravenous narcotism with ulceration of left foot. Pending further study."

Thereafter, in handwriting, he opined that the cause of death was:

"Chronic subcutaneous and intravenous narcotism with acute and chronic ulcerations and cellulitis of left foot."

The laboratory findings found methadone present in tissue, and no other drugs. However, the cellulitis and the chronic subcutaneous and intravenous narcotism found as causes of death were not the product of orally administered methadone maintenance by Dr. Dale, but rather the results of ingestion of illegal narcotics by unclean hypodermic needles. The Medical Examiner's records show that the patient was on methadone, had "taken pills" at 5:00 P.M., and that the mother awoke him after 5:00 A.M., and found the patient unresponsive.

It cannot be said with precision that the autopsy report was as described by Steinberg to the grand jury, or that Dr. Dale "killed" Richardson.

The deposition of Bruce Ira Covner, taken in this action shows that he had been employed as a counselor in Dr. Dale's methadone maintenance clinic at the relevant times until December 1971, and was familiar with Richardson's case. It was Covner who had complained to the BNDD authorities, as he had the right to do, concerning irregularities in the way patients were treated at Dr. Dale's methadone maintenance clinic.

Covner is not a defendant, nor is he an employee or agent of the BNDD. Steinberg, at the time he testified to the grand jury, could reasonably regard Covner as a reliable informant because of his presence at the clinic, and the corroboration of his complaints resulting from the BNDD investigation of the Dale clinic. The prior comments and criticisms which Covner had made to BNDD with reference to Dr. Dale's administration of the methadone program and its recordkeeping, were essentially supported by the results of the investigation.

Covner testified at deposition in this case that "I told Mr. Steinberg that I believed that Dr. Dale was responsible for this patient's [Richardson's] death."

There is no evidence to refute this testimony. (Dep. p. 21, line 13). Covner, now a physician, but in 1971 a social worker employed by Dr. Dale, testified at the deposition that he was led to that conclusion because "this young man had died while on Dr. Dale's program, and he died under suspicious circumstances that led me to believe were connected to the administration of the methadone." Whether or not Covner's inference, based in part upon a "stormy interview" between Dr. Dale, Richardson, and Richardson's mother, in which Covner in 1982 describes the patient as having been "belittled, humiliated and embarrassed" by Dr. Dale (Tr. p. 23) was a reasonable inference, or the only inference is beside the point. Covner had also heard Dr. Dale make a false statement to the Medical Examiner's office concerning the status of Richardson's prior urine reports. (Tr. p. 25). However, Covner, in his deposition in July of 1982, denied that he had ever seen the autopsy report on James Richardson until June of 1982, so the informant, while he provides a basis for Steinberg's opinion that Dr. Dale "Killed" Richardson, cannot be regarded as the source of so much of Steinberg's grand jury testimony which misstates the contents of that report.

Steinberg testified at his deposition, and there is no evidence to contradict him, that he, a lay person, having already talked to Covner, and having heard Covner's opinion as to what happened to Richardson, did in fact read the autopsy report, and he misinterpreted it.

Steinberg testified as follows (p. 41):

"Q Will you tell me, looking at that document [the autopsy report] where you draw the conclusion that the cause of death was methadone?

A The final cause of death was chronic narcotism, and the only narcotic that—the only thing present in his system was methadone."

I find that this is a reasonable but erroneous lay interpretation of the particular autopsy report. Under all the circumstances in light of Covner's information and Dr. Dale's actions indicative of consciousness of guilt (or inappropriate dispensing) in connection with Richardson's death, it is certainly not surprising.

Steinberg also testified as follows (p. 42): "I am not a doctor. I spoke to Dr. Baden [the Medical Examiner] before I got that [autopsy] report, and he told me that it was narcotism, and the only narcotic present in Richardson at the time was methadone. I asked him if that was the cause of death and he said yes. He hemmed and hawed, but I pressed the issue and he said yes."

Steinberg admitted that he never discussed the cause of Richardson's death with Dr. Dale (p. 47). Dr. Baden has never denied the discussion attributed to him.

Steinberg's testimony on deposition, taken December 27, 1974, was consistent with the later testimony of Covner. Steinberg testified (Tr. p. 34) that he learned as a result of a conversation with Covner in the Fall of 1972 that:

"[I]t was Covner's contention that Richardson died of a methadone overdose [and], that Dr. Dale falsified a report to the medical examiner's office because he was standing right next to Dr. Dale when Dr. Dale made the telephone call, and he also said that the patient record [of Richardson] had disappeared out of the files."

At the same time that Covner made this accusation, he furnished a Xerox copy of the patient record file of James Richardson to the BNDD agents.

Steinberg's testimony on deposition, reiterated many times (see, *e.g.*, p. 51), concerning the methadone death of Richardson is that "it is not a federal offense, that is not anything we [the BNDD] were accusing him of." Regrettably, however, a death associated with over-dispensing is inflammatory evidence making the false statements and unlawful dispensing of the methadone more serious to grand jurors, than they otherwise might have been. As noted before, there was more than sufficient relevant hearsay evidence before the grand jury so that it must indict in accordance with its oath, and it cannot be said that the arguably mistaken testimony of Steinberg about the death of Richardson was such as to result in an indictment which would not otherwise have issued. Accordingly, the remaining plaintiff suffered no damage as a result of what Steinberg said. On this ground, summary judgment should be granted.

If we are mistaken in our conclusion that the facts concerning the Tenth claim pleaded call for no damage award because of an inability to prove causation of damage, then we consider Steinberg's claim of objective good faith, under *Harlow v. Fitzgerald*, —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) a case decided long after this complaint was drafted. That case may be read as intending to encourage the district courts, in *Bivens* litigation, to grant summary judgment in favor of harried federal officials on the issue of "good faith," in advance of trial, and indeed before a non-frivolous plaintiff has had a chance to avail himself of the usual hectoring, expensive and dilatory pre-trial depositions of which the federal judiciary appears to be so fond. Whether this new departure will be effective and whether the spirit of *Harlow* will find acceptance in intermediate courts of appeal taken with the not surprising view that such issues as knowledge, intent and even objective good faith, are for the trial jury, remains to be seen. In its efforts to cram the *Bivens* genie back into the bottle, the Supreme Court wrote:

"In *Butz v. Economou*, [438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978)] we extended the approach of *Scheuer* [*Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)] to high federal officials of the Executive Branch. Discussing in detail the considerations that also had underlain our decision in *Scheuer*, we explained that the recognition of a qualified immunity defense for high executives reflected an attempt to balance competing values: not only the

importance of a damages remedy to protect the rights of citizens, 438 U.S., at 504–505 [98 S.Ct., at 2909–2910], but also 'the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority.' *Id.,* at 506 [98 S.Ct., at 2910]. Without discounting the adverse consequences of denying high officials an absolute immunity from private lawsuits alleging constitutional violations—consequences found sufficient in *Spalding v. Vilas,* 161 U.S. 483 [16 S.Ct. 631, 40 L.Ed. 780] (1896), and *Barr v. Matteo,* 360 U.S. 564 [79 S.Ct. 1335, 3 L.Ed.2d 1434] (1959), to warrant extension to such officials of absolute immunity from suits at common law—we emphasized our expectation that insubstantial suits need not proceed to trial:

> 'Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief ..., it should not survive a motion to dismiss. Moreover, the Court recognized in *Scheuer* that damages suits concerning constitutional violations need not proceed to trial, but can be terminated on a properly supported motion for summary judgment based on the defense of immunity ....
> In responding to such a motion, plaintiffs may not play dog in the manger; and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits.' 438 U.S., at 507–508 [98 S.Ct., at 2911] (citations omitted).

> \* \* \* \* \* \*

Even if they cannot establish that their official functions require absolute immunity, petitioners assert that public policy at least mandates an application of the qualified immunity standard that would permit the *defeat of insubstantial claims without resort to trial.* We agree. The resolution of immunity questions inherently requires a balance between the evils inevitable in any available alternative. In situations of abuse of office, an action for damages may offer the only realistic avenue for vindication of constitutional guarantees. *Butz v. Economou,* 438 U.S., at 506 [98 S.Ct., at 2910]; see *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 410 [91 S.Ct. 1999, 2011, 29 L.Ed.2d 619] (1971) ('For people in Bivens' shoes, it is damages or nothing.'). It is this recognition that has required the denial of absolute immunity to most public officers. At the same time, however, it cannot be disputed seriously that claims frequently run against the innocent as well as the guilty—at a cost not only to the defendant officials, but to the society as a whole [footnote omitted]. These social costs include the expense of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office. Finally, there is the danger that fear of being sued will 'dampen the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties.' *Gregoire v. Biddle,* 177 F.2d 579, 581 (CA2 1949), *cert. denied,* 339 U.S. 949 [70 S.Ct. 803, 94 L.Ed. 1363] (1950).

In identifying qualified immunity as the best attainable accommodation of competing values, in *Butz, supra* [438 U.S.], at 507–508 [98 S.Ct., at 2911], as in *Scheuer,* 416 U.S., at 245–248 [94 S.Ct., at 1691–1692], we relied on the assumption that this standard would permit '[i]nsubstantial lawsuits [to] be quickly terminated.' 438 U.S., at 507–508 [98 S.Ct., at 2911]; see *Hanrahan v. Hampton,* 446 U.S. 754, 765 [100 S.Ct. 1987, 1993, 64 L.Ed.2d 670] (POWELL, J., concurring in part and dissenting in part) [footnote omitted]. Yet petitioners advance persuasive arguments that the dismissal of insubstantial lawsuits without trial—a factor presupposed in the balance of competing interests struck by our prior cases—requires an adjustment of the 'good faith' standard established by our decisions.

Qualified or 'good faith' immunity is an affirmative defense that must be pleaded by a defendant official. *Gomez v. Toledo,* 446 U.S. 635 [100 S.Ct. 1920, 64 L.Ed.2d 572] (1980) [footnote omitted]. Decisions of this Court have established that the 'good faith' defense has both an 'objective' and a 'subjective' aspect. The objective element involves a presumptive knowledge of and respect for 'basic, unquestioned constitutional rights.' *Wood v. Strickland,* 420 U.S. 308, 320 [95 S.Ct. 992, 999, 43 L.Ed.2d 214] (1975). The subjective component refers to 'permissible intentions.' *Ibid.* Characteristically the Court has defined these elements by identifying the circumstances in which qualified immunity would *not* be available. Referring both to the objective and subjective elements, we have held that qualified immunity would be defeated if an official *'knew or reasonably should have known* that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], *or if he took the action with malicious intention* to cause a deprivation of constitutional rights or other injury . . . .' *Id.,* at 321–322 [95 S.Ct., at 1000] (emphasis added) [footnote omitted].

The subjective element of the good faith defense frequently has proved incompatible with our admonition in *Butz* that insubstantial claims should not proceed to trial. Rule 56 of the Federal Rules of Civil Procedure provides that disputed questions of fact ordinarily may not be decided on motions for summary judgment [footnote omitted]. And an official's subjective good faith has been considered to be a question of fact that some courts have regarded as inherently requiring resolution by a jury [footnote omitted].

In the context of *Butz's* attempted balancing of competing values, it now is clear that substantial costs attend the litigation of the subjective good faith of government officials. Not only are there the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service. There are special costs to 'subjective' inquiries of this kind. Immunity generally is available only to officials performing discretionary functions. In contrast with the thought processes accompanying 'ministerial' tasks, the judgments surrounding discretionary action almost inevitably are influenced by the decision-maker's experiences, values, and emotions. These variables explain in part why questions of subjective intent so rarely can be decided by summary judgment. Yet they also frame a background in which there often is no clear end to the relevant evidence. Judicial inquiry into subjective motivation therefore may entail broad-ranging discovery and the deposing of numerous persons, including an official's professional colleagues [footnote omitted]. Inquiries of this kind can be peculiarly disruptive of effective government.

\* \* \* \* \* \*

Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law [footnote No. 31], should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. [Fn. No. 31. This case involves no claim that Congress has expressed its intent to impose 'no fault' tort liability on high federal officials for violations of particular statutes or the Constitution.]

\* \* \* \* \* \*

By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made

to hesitate; and a person who suffers injury caused by such conduct may have a cause of action [footnote omitted]. But where an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.' *Pierson v. Ray,* 386 U.S. 547, 554 [87 S.Ct. 1213, 1217, 18 L.Ed.2d 288] (1967) [footnote omitted]."

 All the evidence in this case, developed fully by pre-trial depositions no longer contemplated in light of *Harlow, supra,* tends to show that Steinberg was acting in good faith, although mistakenly, when he placed his lay interpretation on the autopsy report, and did so in the context of his prior discussions with the reliable informant Covner and his telephone conversation with the Medical Examiner. Although objective good faith is an affirmative defense under *Harlow,* —— U.S. at ——, 102 S.Ct. at 2735, all evidence before me points to a conclusion that Steinberg's testimony about the death of Richardson and the content of the autopsy report was given in good faith. There is no evidence of malice or intent to

lie about Dr. Dale as to this essentially immaterial matter. If the *Harlow* decision means what it says, defendant Steinberg is entitled to summary judgment on this point, based on the affirmative defense of mistaken actions taken in objective good faith.[1]

Our discussion heretofore has assumed that the Tenth "cause of action" states a claim upon which, under *Bivens,* relief may be granted. We now examine, somewhat gingerly, the validity of that assumption.

 The burden to show that facts pleaded state a claim upon which relief can be granted rests upon the pleader. As we pointed out, Steinberg, in this case did not perjure himself before the grand jury. He (and Covner) were merely mistaken as to the inferences flowing from the fact of Richardson's death and the meaning and interpretation of the autopsy report. Perjury requires a *mens rea.* It is a federal crime. See 18 U.S.C. §§ 1621, 1623. Mistaken conclusions, or unjustified inferences testified to negligently, or even recklessly, are not a crime.

1. Without appearing to criticize the solemn utterances of the Supreme Court as impractical, the *Harlow* decision seems to us a small courtplaster which cannot stanch the hemorrhage of governmental efforts and resources expended in avoiding or resisting the ever increasing spiteful and unfounded torrent of *Bivens* claims. Objective good faith has always been understood to be an affirmative defense, to be pleaded and proved.

Essentially it is a claim that the actor's conduct was "reasonable" under all the circumstances even if arguably wrong. The reasonableness of challenged intentional conduct is not the sort of issue which can be resolved by affidavit, especially in suits where there has been no pre-trial discovery. In suggesting that such a finding may be made at an early stage in the typical *Bivens* case, the *Harlow* opinion flies in the face of long standing authority to the contrary found in cases decided under Rule 56, F.R.Civ.P. *Cf., Schmidt v. McKay,* 555 F.2d 30 (2d Cir.1977); *Camire v. United States,* 535 F.2d 749 (2d Cir.1976); *In re M/T Alva Cape,* 405 F.2d 962 (2d Cir.1969); *Machleder v. Diaz,* 538 F.Supp. 1364 (S.D.N.Y.1982).

Qualified good faith immunity under *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) will prove inadequate protection for federal officials and employees required to exercise discretion and judgment; absolute civil immunity is needed to assure this necessary freedom of decision making and stop the litigation drain. Ultimately, unless this happens, we will be left with the undesirable situation foreseen by Judge Learned Hand, in *Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir. 1949) in that the fear of being sued will have "dampen[ed] the ardor of all but the most resolute, or the most irresponsible [public officials], in the unflinching discharge of their duties." An undue and ever increasing commitment of resources of all branches of Government is occupied, wastefully and to no purpose, in the litigation of such claims. And all to no purpose because in most cases, a *Bivens* violation will also constitute a state or federal crime, thereby assuring deterrence. Also, offending agents can be fired. Furthermore, in most cases, the genuine victim of such a tort will be compensated by the sovereign under the Federal Tort Claims Act, apparently a *concurrent* remedy when available. See *Hernandez v. Lattimore,* 612 F.2d 61 (2d Cir.1979).

In cases of claimed official abuse of power, where there is such a concurrent remedy under the Federal Tort Claims Act, what is the purpose of a *Bivens* claim?

 Is the giving of false or recklessly unfounded testimony under oath a tort? And when done by a federal agent does it give rise to a *Bivens* claim? For many years, any district court would have answered this question in the negative, without ado. There are sufficient incentives for truth, and disincentives for lying, imposed upon a witness so that adding the threat of civil litigation is unlikely to increase the assurance of witness truthfulness. Our jurisprudence developed in centuries during which sudden death was ever present and most witnesses had a sure hope and fear of the life of the world to come, in which perjury would be dealt with by a Higher Judge. The oath had great force, and it was clear public policy that a witness taking the oath (often under temporal coercion) was to be immune from civil liability at the hands of those claiming untruthfulness. This common law civil immunity of witnesses with respect to their testimony was well recognized. The penal law and the wrath of God were considered sufficient, alone or together, to assure truthful testimony. As the Court held in *Charles v. Wade,* 665 F.2d 661, 666 (5th Cir.1982):

> "It is clear that at common law a witness was absolutely protected from any suit arising from his testimony in a judicial proceeding, *Myers v. Bull,* 599 F.2d 863, 866 (8th Cir.1979), *cert. denied,* 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d 138 (1980); *Brawer v. Horowitz,* 535 F.2d 830, 837 (3d Cir.1976), even if his testimony was perjured and malicious. 1 F. Harper & F. James, The Law of Torts, § 5.22 at 423–24 (1956); W. Prosser, The Law of Torts, § 114 at 777 (4th ed. 1971). The witness' immunity—like the immunity accorded to judges and prosecutors—was based upon his status as an essential participant in the judicial process:
>
> > The function of witnesses is fundamental to the administration of justice. The court's judgment is based on their testimony and they are given every encouragement to make a full disclosure of all pertinent information within their knowledge.

1 Harper & James, *supra* at 424. The common law perceived that the policy of encouraging a witness' free and uninhibited cooperation in the fact-finding process would best be served by insulating the witness from the threat of civil liability for his testimony. Without such immunity, the witness might gauge each of his statements in terms of the possibility of his own personal liability and, therefore, lack the candor and freedom of expression considered essential to the proper functioning of the judicial process. *See* Veeder, Absolute Immunity in Defamation: Judicial Proceedings, 9 Colum.L. Rev. 463, 469 (1909). The resulting lack of any civil remedy against the dishonest witness 'is simply part of the price that is paid for witnesses who are free from intimidation by the possibility of civil liability for what they say.' Prosser, *supra* at 778.

A majority of federal appeals courts to consider the question have held that the policies that underlie the common law rule of absolute witness immunity apply with equal force in a § 1983 action or its counterpart, a *Bivens*-type claim [footnote and citations omitted]. We agree with the majority position. No one can doubt that the need for full disclosure and free expression by witnesses is as important in a § 1983 'constitutional tort' action as in a suit at common law. Because the witness plays such an integral role in the fact-finding process, the reluctant or reticent witness would disserve the ends of justice regardless of the nature of the proceeding. Furthermore, it seems obvious that the prospect of personal liability under a civil rights claim would pose the same risk of intimidation as would the possibility of liability under the common law. It is the threat of money damages that produces the intimidating effect, and that threat is present under either theory of liability. Consequently, the policies underlying the common law rule of absolute immunity also justify providing a witness with immunity from § 1983 liability.

We wish to emphasize that the immunity granted to witnesses—whether under the common law or under § 1983—is not designed to benefit the dishonest witness but to further the broad public interest in having witnesses who are unafraid to testify fully and openly. As Judge Learned Hand remarked in discussing a prosecutor's immunity,

> [a]s is so often the case, the answer must be found in a balance between the evils inevitable in either alternative. In this instance it has been thought in the end better to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.

*Gregoire v. Biddle,* 177 F.2d 579, 581 (2d Cir.1949), *cert. denied,* 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950), *quoted approvingly in Imbler v. Pachtman, supra,* 424 U.S. [409] at 428, 96 S.Ct. [984] at 994 [47 L.Ed.2d 128]. The protection accorded to the dishonest witness is simply a necessary consequence of a rule deemed essential to maintaining the integrity of the judicial process. Moreover, granting immunity from § 1983 liability does not provide witnesses with a license to testify falsely or 'leave the public powerless to deter misconduct or to punish that which occurs. This Court has never suggested that the policy considerations which compel civil immunity for certain governmental officials also place them beyond the reach of the criminal law.' *Imbler v. Pachtman, supra,* 424 U.S. at 429, 96 S.Ct. at 994. The witness who lies on the stand may be prosecuted for perjury. *Brawer v. Horowitz, supra,* 535 F.2d at 837. This threat of criminal sanctions provides a sufficient deterrent against abuse of the witness privilege. *Burke v. Miller, supra,* 580 F.2d [108 (4th Cir.1978)] at 111. '[I]f the risk of having to defend a civil damage suit is added to the deterrent against such conduct already provided by criminal laws against perjury and subornation of perjury, the risk of self-censorship becomes too great.' *Imbler v. Pachtman, supra,* 424 U.S. at 439–40, 96 S.Ct. at 999 (White, J., concurring)."

In *Briscoe v. LaHue,* 663 F.2d 713, 721 (7th Cir.1981), a panel of the Seventh Circuit also held that a witness, even a public official (police) witness enjoys absolute civil immunity for false testimony in a § 1983 case. *Certiorari* was granted by the Supreme Court in *Briscoe* on March 22, 1982. See 455 U.S. 1016, 102 S.Ct. 1708, 72 L.Ed.2d 132. While lawyers may infer that a Supreme Court considering its docket unduly congested is unlikely to have granted *certiorari* on this opinion in order to bless it, this Court need not reach that conclusion.

Opposed to the long tradition of witness immunity we have this admittedly adverse straw in the wind and some outrageously *obiter dicta* of a majority of the learned judges, sitting *en banc* of the old Fifth Circuit in *Rodriguez v. Ritchey,* 556 F.2d 1185, 1195, 1200 (5th Cir.1977) to the effect that an effort by a federal officer "maliciously or in bad faith" to seek to obtain an indictment from a grand jury would be actionable under *Bivens,* notwithstanding that the grand jury voted the indictment. *Rodriguez* was not cited in the later Fifth Circuit case of *Charles v. Wade, supra,* either by the panel majority, nor the dissent. *Briggs v. Goodwin,* 569 F.2d 10 (D.C.Cir. 1977), *cert. denied,* 437 U.S. 904, 98 S.Ct. 3089, 57 L.Ed.2d 1133 (1978), relied upon by the dissent in *Charles v. Wade, supra,* is a case presenting unusual facts. In that *Bivens*-type case, a federal prosecutor was sued when at the direction of the court he had taken the stand to testify under oath as to a fact which normally would merely be stated to the court on the record without testifying, *i.e.,* whether any grand jury witness then before the court were "agents or informants of the United States of America." His answer in the negative was alleged to be false. The Court of Appeals (Judge Wilkie dissenting) treated the prosecutor, under a convoluted analysis of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), as having been engaged in "an act of investigation rather than advocacy" (p. 21) and held that his "alleged perjury bears no relation whatever to the

advocate's role as conceived by the Supreme Court in *Imbler*." Appellant in *Briggs* had not asserted *witness* immunity below, and the certification under 28 U.S.C. § 1292(b) by which the appeal had been taken did not tender that issue to the Court. Nor was the matter briefed. However, in its zeal to feed the rapacious genie of *Bivens,* the majority in *Briggs* first held, correctly on the facts of that case that:

> "The dissent . . . is unrealistic in treating appellant not as a prosecutor managing and directing an investigation but rather as an ordinary witness summoned to give his evidence in a legal proceeding. It is obvious from the transcript that the court did not consider appellant to be an ordinary witness. It ordered him to take the stand; it asked him one question; and it forthwith excused him. Indeed, when appellees' counsel sought leave to cross-examine, the court denied it. The policies underlying the common law doctrine of witness immunity are tangential, and essentially irrelevant, to the question of whether appellant—a prosecutor functioning in an investigative context—should be accorded complete invulnerability to suit for the consequences of an act performed in that capacity.

> \* \* \* \* \* \*

> If we have misconceived the precise scope of *Imbler,* then our finding of qualified, as distinct from absolute, immunity on the facts of this will fall. But that result, in our submission, will not be because appellant's answer to the question put to him by the court was given from the witness stand. It will be because that act will be deemed, even under the special circumstances of this case, not to come within the prosecutorial administrative and investigative functions reserved by *Imbler*." (569 F.2d at 27).

The Court continued in much the same sort of dictum found in *Rodriguez:*

> "We observe further that the dissent does not refer us to cases which establish the existence and scope of witness immunity under *federal* common law [footnote omitted]. As noted earlier (see note 8

*supra* ), even where common law torts are alleged, the immunity to be conferred on federal officials is governed by a federal standard, which need not be identical to the standard applied in a particular state or even in the majority of states.

Finally, it is far from clear that, as the dissent asserts, a witness should enjoy the same measure of immunity, regardless of whether the wrong of which he is accused rises to constitutional dimension. Whatever the precise nature of the immunity accorded to witnesses at common law, that immunity applies without distinction to *any individual* serving as a witness in a judicial proceeding. On the other hand, where a constitutional infringement is alleged, the defendant-witness will almost invariably be a *Government official.* (At minimum, the 'under color of law' requirement will assure some direct government involvement in the challenged testimony.) This is a crucial difference. Policy considerations counselling the insulation of *private citizens* from civil liability arising from their performance as witnesses do not apply with equal force when a complaint charges that constitutional rights have been violated by a *public employee* operating from the witness stand.

. . . . Given [the] notably solicitous attitude toward the effectuation of constitutional guarantees, it can be asserted with both reason and authority that absolute immunity is not to be extended to the constitutional tort context absent the most compelling justification.

\* \* \* \* \* \*

Even where the Supreme Court has followed the common law example in determining that absolute immunity is appropriate in a constitutional tort setting, the Court has explicitly recognized that it was in no way *bound* by precedent to reach the result it did. (Citations omitted).

Since, for the reasons outlined above, we do not believe that appellant is protected by the absolute prosecutorial immunity described in *Imbler,* and *since we are*

*unable to join in the dissent's interpretation of the impact of witness immunity on this case,* the November 20, 1974 order of the District Court denying appellant's motion to dismiss is affirmed." (Emphasis added).

By the time this dictum reached the dissenting judge in *Charles v. Wade, supra,* it had become a "holding of the District of Columbia Circuit." See p. 669 of 665 F.2d. Dissenting in *Briggs,* Judge Wilkie observed that "my colleagues are the victims of their stage props," (*id.,* p. 46) and also observed (pp. 48–49):

"[N]either my colleagues nor I can envision the full practical impact of bringing an increased scope of liability to the witness stand, but the majority's new rule surely bears implications, only partially suggested here, that summon the majority to a much fuller consideration of the witness immunity. Before turning completely to the issue, I note with regret that the majority totally abstains from any consideration of the policies behind witness immunity, only noting that they 'do not apply with equal force' when a constitutional violation is alleged [footnote omitted].

C. *Absolute Immunity for Witnesses— Supreme Court Precedent, Logic, Policy, and History*

In considering whether a witness should be accorded absolute immunity in a *Bivens*-type suit or any other, it must be emphasized that historically all of the essential participants in the judicial process enjoyed an absolute immunity from civil suit for their words and actions relevant to the judicial proceedings. This included the judge, petit jurors, grand jurors, counsel, and witnesses. Absolute immunity was regarded as essential to each, if justice was to have the full and uninhibited cooperation of those participants whose role was and is absolutely vital to the working of the entire judicial process. As Justice White declared in *Imbler* [footnote omitted], 'It is essential to the ends of justice that all persons participating in judicial proceedings ... should enjoy freedom of speech in the discharge of their public duties or in pursuing their rights, without fear of consequences.'

This is not to say that improper conduct in the courtroom or elsewhere by any participant could not then and cannot today be punished. . . . Witnesses have always been subject to punishment for contempt, perjury, or possibly obstruction of justice. Criminal penalties likewise have been applied to petit jurors and grand jurors. No immunity protects these persons from criminal prosecution . . ., if anyone should act contrary to law in the performance of his office.

But none of these participants, essential to the functioning of the judicial process, has ever been held to be subject to a *civil suit* by an allegedly aggrieved party because of anything said or done while functioning in the role of judge, juror, witness, or counsel.

The reasons for the historic common law absolute immunity of these essential participants is obvious on analysis, which will be developed in the following pages. What the majority of this court does in this decision is not just throw open one possibly errant prosecutor to civil liability, but to tear the whole seamless fabric of absolute immunity granted essential participants in the judicial process from time immemorial.

If we were to accept the majority's rationale here, the impact of the *Bivens* case and § 1983 on historic common law immunities would be devastating. Fortunately, that is not the way the Supreme Court has gone about its analysis. I can only deduce from it that the witness, particularly a public official as witness, should be accorded the same absolute immunity as the other participants."

Judge Wilkie continued (*id.,* p. 50):

"The absolute immunity of the witness at common law is as firmly rooted in history and as widely accepted by the courts as is the absolute common law immunity that was accepted for legislators ..., for judges ..., and for prosecutors ....

Immunities for various participants in the judicial process were already established by courts as early as the sixteenth century [footnote omitted], and in 1772 Lord Mansfield announced the comprehensive rule: 'Neither party, witness, counsel, jury nor judge can be put to answer, civilly or criminally for words spoken in office.' [Footnote omitted]. Accepted as 'practically [the] universal rule in this country,' [footnote omitted] this rule of absolute immunity means that a witness in judicial proceedings cannot be held liable in civil damages for injury that ensues from any relevant testimony. Of particular significance is that this rule is also applied as a matter of *federal* common law, [footnote omitted] which, the majority tells us, [footnote omitted] is an important focus for the formulation of a federal immunity standard. Absolute witness immunity has been carried into the Restatement of Torts [footnote omitted] and has been set out approvingly by the commentators as well [footnote omitted]. It is notable that in *Imbler* itself Justice White wrote that the need to protect the judicial process at common law meant that absolute immunity 'applied to suits against witnesses themselves for delivering false and defamatory testimony.' [Footnote omitted].

Do the policies that underlie the common law immunity for a witness warrant the continued availability of absolute immunity in § 1983 or *Bivens*-type suits? The policy behind the common law reflects a balancing process. In the context of a defamation suit [*Petty v. General Acc. Fire etc., Assurance Corp.*, 365 F.2d 419, 424 (3rd Cir.1966)], Judge Hastie expressed the rationale for absolute witness immunity as follows [footnote omitted]:

> This rule reflects the prevailing common law view that the public interest in freedom of expression by participants in judicial proceedings, uninhibited by any risk of resultant suits for defamation, outweighs the interest of the individual in the protection of his reputation from defamatory impairment in the judicial forum.

The reason for the public interest in the 'freedom of expression' of a witness is that the judgment of the judicial process itself, the centerpiece of all judicial immunities, may well be based on the testimony of the witness and the witness, thus, should be fully encouraged to disclose pertinent information. 'For a witness,' Justice White states, 'this means he must be permitted to testify without fear of being sued if his testimony is disbelieved.' [Footnote omitted]. Full disclosure may be impaired, in other words, if there can be 'intimidation' deriving from 'the possibility of civil liability.' [Footnote omitted].

Set against the value of full freedom for the witness is, as Judge Hastie noted, the possible damage, *e.g.*, to the reputation of others, that may ensue. This danger has its limits, however, because witnesses are, of course, 'subject to the control of the trial judge and are subject to contempt citations for misbehavior in the exercise of the privilege and to prosecution for perjury if convicted of knowingly giving false testimony.' [Footnote omitted]. Thus, with a deterrent already available against perjury by a witness in the form of criminal sanctions, the common law regarded the additional deterrent of having to defend a civil damage suit as rendering 'the risk of self-censorship ... to great.' [Fn. No. 92. *Imbler, supra*, 424 U.S. at 440, 96 S.Ct. at 999 (White, J.)].

In striking the balance in favor of absolute immunity, the common law meant in no way to derogate the duty of the witness to state the facts objectively. Of course, the witness has no discretion to commit perjury, but, to borrow from Learned Hand, it might be 'impossible to know whether the claim [of perjury] is well founded until the case has' been tried.' [Fn. No. 93. *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir.1949), *cert. denied*, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950)]. Such a possibility, Judge Hand concluded (in the context of prosecutorial immunity), could 'dampen the ardor' [footnote omitted] of even the person

intending to perform truthfully and properly. The witness immunity at common law is apparently so thorough that it makes no exception for an action where the perjury seems, on the face of the complaint, to admit of no ambiguity .... Even though it might be 'monstrous to deny recovery' [footnote omitted] in that case, the common law is so unwilling to expose the honest witness to any civil risk that it would not allow even that case to go to trial.

The policies underlying common law immunity for a witness justify the availability of absolute immunity for a witness sued in a § 1983 or *Bivens*-type action. As noted, the common law regarded absolute immunity for the witness as essential to the protection of the integrity of the judicial process. Similarly, each time the Supreme Court in a § 1983 suit has considered the immunities related to the judicial process, the Court has continued the absolute immunity of the common law—for judges in *Pierson* and for prosecutors in *Imbler*. Indeed, the *Imbler* Court strongly suggested, both in the majority and separate opinions, that it would readily extend the full immunity to grand jurors [footnote omitted] and defense counsel [footnote omitted]. The Court's continued extension of absolute immunity to all the participants in the judicial process, which undeniably includes witnesses, represents a thorough acceptance of the common law policy that the provision of only qualified immunity might inhibit the full disclosure of relevant evidence and impair the judgment of the court. In each instance the common law policy has been assessed as a 'compelling' enough justification for the absolute immunity also to be available for constitutional torts."

This Court agrees with Judge Wilkie both in his analysis of the competing public interests affected here, and his analysis of the thrust of *Imbler v. Pachtman.* The majority's contrary view in *Briggs* is dictum most mischievous.

We now consider *Hilliard v. Williams,* 516 F.2d 1344, 1349 (6th Cir.1975), vacated and remanded for further consideration in light of *Imbler v. Pachtman,* 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). On remand the Court of Appeals, at 540 F.2d 220 (6th Cir.1976) concluded that the prosecutor Williams, who had counseled the witness Clark, a state law enforcement agent, to lie, enjoyed absolute immunity, and vacated the civil rights judgment against him. However, without discussion, it allowed the judgment against Clark to remain in effect. In its original decision that Court had held, in a § 1983 action that:

"[W]e are unable to agree with several of the [district] court's conclusions of law. In Conclusion No. 4, the District Court stated that Attorney General Williams 'advised Donn Clark not to mention the report at the first criminal trial unless specifically called for, and thus, we conclude that Clark acted under "advice" of Counsel, Williams.' It is unclear to us whether the District Court viewed Clark's reliance on Williams' advice as an effective defense in this civil rights action. Nevertheless, we think it plain that a law enforcement officer who knowingly gives evasive, misleading, and deceptive testimony during a criminal trial cannot escape civil liability that otherwise would attach merely because the prosecuting attorney instructed him to testify as he did. As the District Court pointed out, Clark was under an affirmative duty to refrain from giving evasive or misleading testimony, and the duty did not disappear when Williams advised Clark to avoid mention of the F.B.I. report." 516 F.2d at 1349.

We all know that hard cases make bad law. Mrs. Hilliard had to serve a year of imprisonment because of a *Brady* violation, and testimony evasive but perhaps not perjurious. However, nowhere in the *Hilliard* case is there any analysis of the traditional immunity available to a *witness* at common law, and indeed the entire issue was buried in the greater issue of the immunity of the prosecutor Williams. The authority of the *Hilliard* opinion, the only case squarely up-

holding the claim which this Court has found, would seem to be slight indeed in light of the foregoing analysis.

Should we be required to reach the point, we would hold Steinberg entitled to absolute immunity, assuming his grand jury testimony is regarded as mendacious and damage causing, which, as noted before, we do not think it is.

The motion for summary judgment is granted in all respects. The Clerk shall enter final judgment.

So Ordered.