**Robert T. DALE, Plaintiff-Appellant,**

v.

**John BARTELS, et al., Defendants-Appellees.**

**No. 617, Docket 83–6012.**

United States Court of Appeals, Second Circuit.

Argued Jan. 27, 1983.

Decided April 5, 1984.

See also, D.C., 532 F.Supp. 973.

---

Robert T. Dale, pro se.

Jane E. Bloom, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty., and Peter Salerno, Asst. U.S. Atty., S.D.N.Y.), New York City, for defendants-appellees.

Before FRIENDLY, MESKILL and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal is from an order of Judge Brieant in the District Court for the Southern District of New York, 552 F.Supp. 1253 (1982), granting defendants' motion for summary judgment in an action for violation of plaintiff's civil rights by federal officials. The action has recently celebrated its tenth anniversary.

Plaintiff, Robert T. Dale, a licensed physician, operated a methadone maintenance clinic in New York City. He opened the clinic in early 1971 after obtaining the necessary approval from the Food and Drug Administration. Dale's wife, Lily Farley Ross Dale, was employed as his assistant. On about June 9, 1972, James Steinberg, an agent of the Bureau of Narcotics and Dangerous Drugs ("BNDD") and other BNDD agents under his direction began an extensive investigation and audit of Dale's program. For about six weeks until July 13, 1972, they inspected Dale's records and methadone inventory and observed the operations of the clinic. Upon completing the audit, the agents concluded that a substantial amount of methadone, estimated variously at one to five pounds, could not be accounted for through patient records required to be maintained under 21 U.S.C. §§ 827, 843 and applicable regulations. Steinberg presented the conclusions of the audit to Dale on July 13, 1972. Dale immediately closed the clinic, and he and his wife went quickly to Europe.

On July 17, 1972, warrants were issued for Dale's arrest and for a search of the clinic. Agents then entered the clinic and seized numerous records and methadone tablets as well as cash from a drawer, a photograph from Dale's desk, and two certificates from Dale's office wall. On July 18 or 19, agents visited Dale's residence, questioned his parents who were then staying in the apartment, and, without a search warrant, allegedly seized "a sum of money and certain other items".

While in Europe, the Dales contacted an American lawyer who advised them of the pending arrest warrants. After having been detained by the authorities in Denmark, they agreed to come back to the United States. Their lawyer so informed the United States Attorney and promised to produce the Dales immediately upon their return to New York. The Dales arrived at Kennedy International Airport on January 31, 1973, where they were met by Steinberg and other BNDD agents, arrested, handcuffed, and photographed by the press. Meanwhile, in the Winter 1972–73 issue of the *BNDD Bulletin*, Dale and his wife were featured in the "Wanted by BNDD" section with mug shots, vital statistics, and descriptions as "the largest supplier[s] of illicit amphetamines on the East Coast." In the Fall 1973 issue, identical entries appeared in the magazine's "No Longer Wanted" section, with "IN CUSTODY" superimposed in large letters.

On February 7, 1973, Steinberg testified before a federal grand jury that Dale had, among other things, killed a patient named James Richardson with a methadone overdose, stating that "[w]e know for a fact that Dale did kill him with methadone because we have the coroner's report stating that Mr. Richardson died of a methadone overdose." The medical examiner's report, however, gave as the cause of death "chronic subcutaneous and intravenous narcotism with acute and chronic ulcerations and cellulitis of left foot." It is undisputed that the methadone dispensed at Dale's clinic was taken orally, not by injection.

On February 16, 1973, Dale was indicted on one count of failing to · maintain, on a current basis, complete and accurate records of all methadone received or dispensed by the clinic, as required by 21 U.S.C. §§ 827, 843 and the regulations thereunder; one count of making a false statement to the BNDD regarding the number of patients the clinic had, *see* 18 U.S.C. § 1001; and one count of making a false statement to the BNDD regarding whether James Richardson was a patient of the clinic during the· period that was the subject of the audit, 18 U.S.C. § 1001. Dale's wife was indicted at about the same time on similar charges. In November 1973, the Dales were indicted on charges of income tax evasion; this indictment was superseded in January 1974 by another indictment for tax evasion.[1] In March 1974, the February 1973 indictment was dis-

---

1. The tax evasion charges against Dale were dismissed by Judge Werker in 1978 for reasons related to Dale's questionable competence to stand trial.

missed on the Government's motion. The record does not disclose the Government's reasons for seeking the dismissal.

On March 27, 1974, Dale filed the instant action,[2] naming as defendants Steinberg; John Bartels, then Director of the BNDD; Robert Brown, John Atlee, Dennis Borst and Douglas Driver, BNDD agents; "certain unknown agents and officers" of the BNDD; and "certain unknown Assistant United States Attorneys". Cornelius J. Daugherty, editor of the *BNDD Bulletin* at the time of publication of the Winter 1972–73 issue, was subsequently added as a defendant. The complaint alleged thirteen causes of action, eight for violations of Dale's rights under the fourth amendment, two for violations of his fifth amendment rights, one for violation of his rights under both the fourth and fifth amendments, and two pendent state claims, one for an arrest unlawful under New York law and the other for defamation.

. The first two claims arose from the inspection and audit of the clinic: the search was allegedly conducted (1) "without probable cause and knowing that probable cause was lacking, in bad faith and for the purpose of harassing plaintiffs", and (2) "in an unreasonable and unconstitutional manner, and in bad faith, in that it was overlong and unnecessarily disruptive of plaintiffs' legitimate and authorized operations, and intrusive into their privacy." The next three claims addressed the search warrant obtained July 17, 1972, and the search of the clinic conducted pursuant to it, alleging that: (3) Steinberg obtained the warrant without probable cause, and either knew that probable cause was lacking or "recklessly and in bad· faith ignor[ed] facts which should have informed him that probable cause was lacking"; (4) defendant agents "seized several objects not authorized to be seized by the warrant"; and (5) defendants seized and turned over to a Dr. Alan Kaye records that they knew belonged to Dale. The sixth claim alleged that a warrantless search of Dale's office

was conducted in September 1972 by IRS agents, who made a further seizure of records. The seventh claim alleged that Dale's arrest at Kennedy International Airport was pursuant to a warrant obtained and executed by defendants "in bad faith and without probable cause, for the purpose of obtaining publicity and for other improper and illegal purposes," and that the authorization of the arrest by an unknown Assistant United States Attorney was similarly illegal and beyond the scope of his or her authority. The eighth claim alleged that Steinberg and other defendant agents entered the Dales' apartment, "harassed and abused the parents of plaintiff Dr. Dale, . . . and seized, stole and converted to their personal use, without warrant or probable cause, and in bad faith, a sum of money and certain other items."

The ninth and tenth claims alleged that Steinberg made false and malicious statements to obtain arrest warrants for the Dales and to obtain the February 1973 indictment from the grand jury, thus depriving Dale of his right to due process of law under the fifth amendment. As an eleventh claim, the complaint alleged that "[a]ll of the above actions constitute, taken together, a pattern of harassment and intentional violations of plaintiff's constitutional rights which in itself is a violation of the Fourth and Fifth Amendments." The twelfth and thirteenth claims alleged causes of action under state law in false arrest, for the arrest at Kennedy airport, and in defamation, for the publication of false allegations about Dale in the *BNDD Bulletin*.

Following more than seven years of intermittent discovery, defendants moved for dismissal of the complaint or summary judgment. After ordering production of the transcript of Steinberg's grand jury testimony, 532 F.Supp. 973 (S.D.N.Y.1982), and examining the transcript, the district court granted summary judgment for defendants, 552 F.Supp. 1253 (S.D.N.Y.1982). The court dismissed defendant Bartels at

---

**2.** The complaint also named as plaintiffs Dale's wife and their minor child, Ross Tatum Dale.

The action was discontinued as to Ross and Mrs. Dale by stipulations filed in 1978.

the outset, holding that it "lack[ed] the power to cause bureaucrats to issue public apologies for the allegedly excessive zeal or incompetence of their subordinates ... [or] to require a certificate of good conduct or a statement of 'wrongly accused' to be issued by the Executive Branch of Government." *Id.* at 1257. As to the audit of the clinic, the court held that probable cause for the inspection warrant had been established and that it was "understandable, and non-actionable, that the social atmosphere of an afternoon tea party may not prevail at such an audit." *Id.* at 1258. The court likewise held that there was probable cause for the search warrant, and found that there was no triable issue as to whether defendants had seized items that were not authorized by the search warrant or whether they had transferred patient records to Dr. Kaye. *Id.* "Similarly," the court found, "there is no evidence of theft of personal property or money from the Dale apartment by any defendant sued here." *Id.* The arrest and handcuffing of Dale were lawful, and there was no evidence that any of the defendants notified the press of the planned arrest. *Id.* The pattern of harassment alleged by Dale was held not to "reach the level of a constitutional tort," *id.* The pendent state law defamation claim was held to be precluded by the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), and by *Barr v. Mateo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434

(1959), and the state law false arrest claim was held to be lacking in merit.

Most of the district court's opinion was devoted to the tenth claim, which alleged that Steinberg caused an indictment to issue against Dale by lying to the grand jury.[3] The court rested its grant of summary judgment for defendants on three independent grounds. First, apparently treating Steinberg's statements regarding the death of James Richardson as the only controverted testimony, the court ruled that Dale had not been harmed by the statements because "there was more than sufficient relevant hearsay evidence before the grand jury so that it must indict in accordance with its oath...." *Id.* at 1263. Next, the court held that the misstatement regarding Richardson's death was a mistake made in objective good faith, and was therefore covered by the qualified immunity of public officials announced in *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). *Id.* at 1263, 1266. Finally, the court held that Steinberg, as a grand jury witness, was entitled to absolute immunity from civil liability for any false testimony he might have given. *Id.* at 1273.[4]

Judgment dismissing the complaint was filed December 21, 1982 and Dale timely noticed this appeal.

## DISCUSSION

With respect to the tenth cause of action, we think it unnecessary to go beyond the district judge's first ground of decision.[5]

**3.** The ninth claim, that Steinberg made "false and malicious" statements leading to the issuance of an arrest warrant against Dale on the recordkeeping charge, appears to have been dismissed for lack of evidence that Steinberg lied to the magistrate about the results of the audit.

**4.** The court also expressed doubt whether the giving of false or recklessly unfounded testimony under oath is a tort and whether, when such action is done by a federal agent, it gives rise to a *Bivens* claim, 552 F.Supp. at 1267, but did not answer these questions in light of its subsequent rulings. For present purposes, we assume without deciding that Dale has stated a cause of action under *Bivens*. *Cf. Briscoe v. LaHue*, 460 U.S. 325, 326 n. 1, 103 S.Ct. 1108, 1111 n. 1, 75 L.Ed.2d 96, 102 n. 1 (1983) (Supreme Court "has

not held that the false testimony of a police officer in itself violates constitutional rights").

**5.** We express no opinion as to the other grounds adduced by the district judge. We note, however, that in the wake of *Briscoe v. LaHue, supra,* one circuit has held that grand jury witnesses enjoy absolute immunity from civil liability under 42 U.S.C. § 1983, *see Kincaid v. Eberle,* 712 F.2d 1023 (7 Cir.1983), a holding consonant with the weight of pre-*Briscoe* authority, *see, e.g., Myers v. Bull,* 599 F.2d 863 (8 Cir.), *cert. denied,* 444 U.S. 901, 100 S.Ct. 213, 62 L.Ed.2d 138 (1979). *But cf. Briscoe v. LaHue, supra,* 460 U.S. at 330 nn. 7–9, 103 S.Ct. at 1113 nn. 7–9, 75 L.Ed.2d at 117–18 & nn. 7–9 (calling into question the existence of a common law immunity for persons making accusa-

The testimony before the grand jury recounted not only the clinic's extensive recordkeeping obligations but also Dale's consternation when the agents announced their intention to conduct an audit. The clinic, it appears, maintained *two* sets of records, one being the formal patient records required by law and the other consisting of a set of dispensing sheets kept by Mrs. Dale.[6] Dr. Dale resisted the agents' request to inspect the formal records, for which they had a warrant, insisting that the formal records be used only for a spot-check of the dispensing sheets and even threatening to close the clinic rather than allow the agents to examine the records in question. Ultimately, however, he permitted the audit to proceed, and for almost six weeks the agents pored over hundreds of patient records in an attempt to determine how much methadone had been dispensed during the "accountability period", which extended from May 1, 1971, to June 8, 1972. When this figure was compared with the clinic's purchases and stock on hand for the same period, several pounds of methadone could not be accounted for. According to Steinberg, this discrepancy was several orders of magnitude greater than what was normally encountered in audits of comparable programs.

On the basis of this testimony, we think it clear that the grand jury had more than probable cause to indict Dale on the recordkeeping charge even omitting Steinberg's statements regarding the death of James Richardson, which, it may be noted, amount to only a small part of over 30 pages of testimony. Accordingly, the district judge was correct in concluding that Steinberg's misstatements regarding Richardson's death could not have been a cause "but for" which Dale would not have suffered the injury complained of. *See Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 286–87, 97 S.Ct. 568, 575–76, 50 L.Ed.2d 471 (1977);

*Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979).

Although the district court did not discuss it, Dale appears also to have contended that Steinberg was guilty of misstatements bearing on the third count, namely, that Dale lied when he denied that Richardson was a patient of the clinic during the accountability period. Steinberg, after testifying to the discrepancy between Dale's estimate of the number of his patients as of June 9, 1972 (approximately 738), and the number arrived at by counting patient records (around 1150), said that on July 11 Dale was discovered in the basement of the clinic "working on" certain records that had already been audited. This led to their seizure, as well as to the agents' being trapped for an hour in the basement of the clinic by a group of patients inflamed by Dr. Dale. He also testified that a counselor at the clinic had told him Dale had hidden two boxes of records during the course of the investigation. On July 13, 1972, the agents returned to report the results of their audit. It was then that Steinberg told Dale that he was suspected of destroying or otherwise withholding at least one patient record.

According to a transcript of the exchange that appeared in the bill of particulars accompanying the indictment, Dale pressed to know which record was missing and was told it was James Richardson's. Dale insisted that the clinic had the record and Mrs. Dale seems to have suggested it had not been produced because Richardson was not a patient during the accountability period. Steinberg replied that Richardson "was a patient during the date in question, which was May one, nineteen ..."—at which point Dr. Dale said, "No, he wasn't." As Steinberg told the grand jury, however, Richardson *had* been Dale's patient "very early in June, 1971, for a period of about two weeks". This was borne out by the testimony of another witness, who stated

---

tions before a magistrate or other judicial officer).

6. Steinberg added that Mrs. Dale's dispensing methadone violated New York law since she was neither a physician nor a nurse.

that dispensing sheets, filled out by Mrs. Dale and signed by Dr. Dale, showed Richardson had been dispensed methadone on several occasions in June 1971.

Here again it seems plain that the grand jury had probable cause to indict Dale for lying about Richardson's status at the clinic. To be sure, Steinberg's assertions regarding Dale's alleged responsibility for Richardson's death provided Dale with an additional motive for deliberate misrepresentation. But the events leading up to the confrontation and the context of the statement itself—the agents' accusation that Dale had destroyed or withheld records—supplied more than enough motive to support an indictment.[7]

■ We are satisfied with Judge Brieant's disposition of the remaining claims [8], with two exceptions discussed below.[9]

1. *Fourth Claim: Unlawful Seizure of Property from the Clinic*

■ The fourth amendment commands that no warrants shall issue but those "particularly describing the ... things to be seized." Seizures of property during a search conducted pursuant to a warrant are limited to (1) the items named in the warrant, (2) any fruits, instrumentalities, or evidence of a crime that are discovered in the course of a search of legitimate scope, and (3) certain kinds of property for which a special reason for seizure, such as officers' safety or safekeeping of cash, can be shown. *See* 2 LaFave, Search and Seizure § 4.1(b) (1978), and authorities cited therein.

■ The search warrant for the clinic named only records and methadone tablets as objects of the search. However, in his sworn answers to defendants' second set of interrogatories, Dale stated that other objects were seized, including a portable tape recorder, cassette recording tape, $800 to $900 in cash, photographs and certificates, an adding machine, a calculator, and medical instruments. Furthermore, the seizure of a photograph and certificates as well as about $400 cash is confirmed in the return on the search warrant which agents Brown and Steinberg signed. No justification for the seizure of any of these items (save possibly the cash which may have been properly taken for safekeeping) has been advanced, and, at least in the case of the

---

**7.** Although Dale does not deny that, in response to the agents' inquiries, he said Richardson was not a patient of the clinic, he contended in the district court that his misstatement reflected a confusion regarding the dates included in the accountability period, which he alleged resulted from Steinberg's referring to a date in 1972. In light of the transcript and the conversational context, however, there can be no doubt that Steinberg was asking about a date in the accountability period, which the agents had been investigating for almost six weeks. Dale may have been momentarily confused, and this confusion might have given him a defense to the charge that he intentionally misstated Richardson's status, but this is hardly evidence that Steinberg testified falsely.

Dale also directed the district court's attention to the fact that the transcript suggests he was willing to provide Richardson's record. However, Dale was not indicted for failure to produce the record. Steinberg did not testify that he refused to do so but only that, at least prior to being confronted, Dale told the agents that they had been given all the relevant records.

**8.** While reliance on *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), as a basis for dismissing a state law claim for defamation was improper, the reliance on *Barr v. Matteo,* 360 U.S. 564, 572–76, 79 S.Ct. 1335, 1340–42, 3 L.Ed.2d 1434 (1959), was proper and sufficient. In any event the pendent state claims are remote from the only federal claims found to have vitality and could properly have been dismissed on that ground. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726–27, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

**9.** The Government contends that since these issues were not argued in Dale's *pro se* brief, they were abandoned, citing, *e.g., Herrmann v. Moore,* 576 F.2d 453, 455 (2 Cir.), *cert. denied,* 439 U.S. 1003, 99 S.Ct. 613, 58 L.Ed.2d 679 (1978); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne,* 605 F.2d 648, 653 n. 3 (2 Cir.1979). However, although appellant's brief was mainly concerned with the tenth claim and with personal attacks on the district judge, it concludes by saying, "There are scores of issues in this case which simply cannot be dealt with by summary judgment motion." Under these circumstances we are not inclined to apply a doctrine of abandonment to a *pro se* litigant.

photograph and certificates, none is apparent. Therefore, the district court erred in finding that there was "no competent evidence" to controvert defendant's denials of unauthorized seizures, 552 F.Supp. at 1258, and the grant of summary judgment for defendants with respect to the items mentioned should be reversed.

2. *Eighth Claim: Unlawful Seizure of Property from the Dales' Apartment*

■ Property may be seized during search of a residence pursuant to a warrant for the resident's arrest [10] only if there is probable cause to believe that the property is a fruit, instrumentality, or evidence of a crime. *See* 2 LaFave, *supra,* § 6.7(a), and authorities cited therein. The property alleged to have been seized from the apartment included cash and a photograph of Dale's wife.[11] In his answers to plaintiff's first set of written questions, Steinberg admitted that he entered the Dales' apartment and "moved through the entire apartment," but denied removing any property from the apartment. Dale, however, stated in an affidavit:

Steinberg and the other agents deny taking any property from the apartment. Yet, my wife and I know that the picture of my wife, which later appeared in the BNDD Journal ... was in that apartment. Furthermore, at a suppression hearing in connection with the tax indictment, 74 Cr. 42, Agent Frances Denham

testified under oath that he had removed the engagement photograph of my wife from the apartment.

Seizure of the photograph, if proved, would constitute a deprivation of Dale's fourth amendment right to be secure against unreasonable seizures. There was therefore a triable issue whether the agents seized property from the Dales' apartment in violation of his constitutional rights. The district court thus erred in finding that there was no "evidence of theft of personal property or money from the Dale apartment by any defendant sued here", and the grant of summary judgment for defendants should be reversed.[12]

■ We confess lack of enthusiasm in reversing and remanding for trial of these two minor claims, when the overwhelming bulk of Dale's complaint was properly dismissed. We find it difficult to imagine how even if these claims are sustained, Dale can recover substantial compensatory damages and the rejection of Dale's basic claim of harassment would seem to preclude the award of punitive damages for minor infractions in the execution of lawful search and arrest warrants. However, unless and until the Supreme Court chooses to place some limits on *Bivens* and its progeny, we see no alternative to reversing the judgment of the district court as to the dismissal of the fourth and eighth causes of action alleged in Dale's complaint and remanding

**10.** The search of Dale's apartment pursuant to the arrest warrant was lawful provided there was reason to believe that Dale was there, *Payton v. New York,* 445 U.S. 573, 602–03, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980), and there is nothing in the record to suggest that such a belief was unreasonable. In any event, Dale suffered no personal damage, other than the alleged loss of property, because he was not present at the time of the search. Dale's parents, who were present, are not parties to this action.

**11.** The complaint alleged that "a sum of money and certain other items" were seized from the apartment, but page 16 of plaintiff's answers to defendants' first set of interrogatories, in which the "other items" were probably enumerated, is missing from both the Supplemental Appendix and the record. Under these special circum-

stances we think it proper to rely on the complaint.

**12.** It should also be noted that the *Harlow v. Fitzgerald* formulation of qualified immunity, which the district court discussed at length with regard to the tenth claim, does not preclude the fourth amendment claims. In that case, the Supreme Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The unlawful seizures alleged by Dale constitute clear violations of well-known fourth amendment rights of which a law enforcement officer such as Steinberg had every reason to be aware.

the case for further proceedings as to them in the respects noted in this opinion. In all other respects the judgment of the district court is affirmed.